**25-4166**

# United States Court of Appeal
## FOR THE TENTH CIRCUIT

UYTE, LLC, AND SEG HOCKEY, LLC

*Plaintiffs-Appellees.*

– v. –

MAMMOTH HOCKEY, LLC,

*Defendant-Appellant,*

*Appeal from the United States District Court for the District of Utah,*

*Case No. 2:25-CV-00639-DBB-CMR, Judge David Barlow*

## DEFENDANT-APPELLANT'S OPENING BRIEF

## ORAL ARGUMENT REQUESTED

GERALD W. GRIFFIN
LEONARDO TRIVIGNO
MEREDITH B. SPELMAN
JANICE J. KWON
ALLISON GUERRA
CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, New York 10005
(212) 732-3200
griffin@clm.com
trivigno@clm.com
spelman@clm.com
kwon@clm.com
guerra@clm.com

*Counsel for Appellant*

February 25, 2026

4911-9953-0642.v1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………...iv

STATEMENT OF RELATED CASES ………………………….…………....1

JURISDICTIONAL STATEMENT ………………………………………..1

STATEMENT OF ISSUES PRESENTED ………………………………...2

STATEMENT OF THE CASE ………………………………………………2

SUMMARY OF ARGUMENT …………………………………………8

THE STANDARD OF REVIEW …………………………………………...10

ARGUMENT …………………………………………………………..12

    I.    The District Court Committed Legal Error by Applying Traditional Forward Confusion Factors in A Reverse Confusion Case ……………13

        A. "Reverse" And "Forward" Confusion ………………………………13

        B. This Is A Classic Case Of Reverse Confusion ………………….…...14

        C. The District Court Erred By Applying a Forward Confusion Analysis ……………………………………………………………...… 16

            1. A Forward Confusion "Intent" Inquiry in a Reverse Confusion Case is Contrary to the Decisions of Several Courts of Appeals and District Courts Within this Circuit………..……………17

            2. There is No Initial Burden to Prove Market Saturation Through Sales Data and Market Share ………………………………...20

            3. The District Court Erred by Failing to Apply a Reverse Confusion Inquiry for Assessing the Strength of the Mark ….22

    II.    The District Court Committed Clear Error In Finding There Is No Likelihood Of Confusion Between the Parties' Marks and Logos ..……24

        A. The Accused Mark And Logo Are Extremely Similar To Mammoth Hockey's Mark And Logo ………………………………..………25

        B. Appellees Took Mammoth Hockey's Mark In Bad Faith…………...28

C. Appellees' Use Of The Accused Mark And Logo Has And Will Cause Actual Confusion ……………………………………………………...31

D. The Parties' Products And Manner Of Marketing are Similar ……...35

E. The Conceptual Strength Of The Mammoth Hockey Mark And the Commercial Strength Of Appellees' Mark Show Confusion...………37

III. The District Court Erred By Failing To Find That Mammoth Hockey Has Established Irreparable Harm …………………………………………..40

IV. Conclusion …………………………………………………………...43

ORAL ARGUMENT REQUESTED …………………………………...………...44

CERTIFICATE OF COMPLIANCE ……………………………………………..45

CERTIFICATE OF SERVICE …………………………………………………46

ATTACHMENT 1: District Court Judgment Filed 12/23/25...……………………47

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*1-800 Contacts, Inc. v. Lens.Com, Inc.*,
   722 F.3d 1229 (10th Cir. 2013)...................................................................... 13, 21

*AAA Alarm & Sec. v. A3 Smart Home LP*,
   2021 U.S.Dist. LEXIS 163919 (D. Ariz. Aug. 30, 2021)....................................43

*Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*,
   935 F.3d 1112 (10th Cir. 2019) ............................................................... 25, 26, 36

*Altira Group LLC v. Philip Morris Cos.*,
   207 F. Supp. 2d 1193 (D. Colo. 2002)....................... 17-20, 23, 28, 37, 39, 41, 42

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
   805 F.2d 920 (10th Cir. 1986)..............................................................................11

*Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Co.*,
   561 F.2d 1365 (10th Cir. 1977)....................................................................... 7, 21

*Collectable Promotional Prods. v. Disney Enters.*,
   2009 U.S. Dist. LEXIS 46775 (W.D. Okla. June 2, 2009) ............... 16, 18, 23, 37

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   269 F.3d 1149 (10th Cir. 2001)............................................................................10

*Dreamwerks Prod. Grp. v. SKG Studio*,
   142 F.3d 1127 (9th Cir. 1998)..............................................................................30

*Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*,
   434 F. Supp. 3d 1227 (D. Utah 2020)......................................... 12, 19, 25, 27-28

*Fisons Horticulture, Inc. v. Vigoro Indus.*,
   30 F.3d 466 (3d Cir. 1994).................................................................... 6, 17, 29, 30

*GrubHub Inc. v. Relish Labs LLC*,
   80 F.4th 835 (7th Cir. 2023) ...............................................................................17

*Instructure, Inc. v. Canvas Techs., Inc.*,
2022 U.S. Dist. LEXIS 2822 (D. Utah 2022).............................. 10, 31, 35-38, 41

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021)..................................................... 27, 29

*J&J Snack Foods, Corp. v. Earthgrains Co.*,
220 F. Supp. 2d 358 (D.N.J. 2002)......................................35

*Kelly-Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013)................................................30

*Marketquest Group, Inc. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017)........................................ 17, 28

*Naimie v. Cytozyme Lab., Inc.*,
174 F.3d 1104 (10th Cir. 1999)..........................................11

*Packerware Corp. v. Corning Consumer Prods., Co.*,
895 F. Supp. 1438 (D. Kan. 1995)......................................31

*Sally Beauty Co., Inc. v. Beautyco, Inc.*,
304 F.3d 964 (10th Cir. 2002)........................................ 24, 27, 35, 36

*Sara Lee Corp. v. Sycamore Family Bakery*,
2009 U.S. Dist. LEXIS 100554 (D. Utah Oct. 27, 2009)....................... 25, 26, 27

*SEBO Am., LLC v. Euraco Grp. Ltd.*,
2019 U.S. Dist. LEXIS 105393 (D. Colo. 2019) ................................................42

*Sec. USA Servs., LLC v. Invariant Corp.*,
2023 U.S. Dist. LEXIS 46962 (D.N.M. 2023)....................................36

*Somerlott v. Cherokee Nation Distribs., Inc.*,
686 F.3d 1144 (10th Cir. 2012)..........................................11

*United States v. Hopkins*,
235 Fed. Appx. 693, 700 (10th Cir. 2007)..........................................11

*Universal Money Ctrs., Inc. v. AT&T*,
   22 F.3d 1527 (10th Cir. 1994) ........................................................................ 18, 25

*Univ. of Kan. v. Sinks*,
   565 F. Supp. 2d 1216 (D. Kan. 2008) ................................................................39

*Wreal, LLC v. Amazon.com, Inc.*,
   38 F.4th 114 (11th Cir. 2022) ...................................7, 16-17, 21-22, 28, 30, 37, 40

**Statutes**

15 U.S.C. § 1116(a) ..............................................................................................39

15 U.S.C. § 1125 ............................................................................................1, 11

28 U.S.C. § 1292 ..................................................................................................1

28 U.S.C. § 1331 ..................................................................................................1

28 U.S.C. § 1338 ..................................................................................................1

28 U.S.C. § 1367 ..................................................................................................1

28 U.S.C. § 2201 ..................................................................................................1

**Other Authorities**

5 McCarthy on Trademarks and Unfair Competition McCarthy's (5th ed. 2025) ......
................................................................................................14, 34, 35

# STATEMENT OF RELATED CASES

There are no prior or related appeals.

# JURISDICTIONAL STATEMENT

Defendant-Appellant Mammoth Hockey, LLC ("Mammoth Hockey") alleges Plaintiffs-Appellees Uyte, LLC and SEG Hockey, LLC ("Appellees") infringe its mark MAMMOTH HOCKEY and accompanying logo of a mammoth's head (the "Mark and Logo") by reverse confusion in violation of 15 U.S.C. § 1125(a) of the Lanham Act and Utah state law. Appellees seek a declaratory judgment of non-infringement. The District Court has subject-matter jurisdiction over this action pursuant 28 U.S.C. §§ 1331, 1338(a), 1367 and 2201, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

Mammoth Hockey appeals an order by the United States District Court of the District of Utah (the "District Court") denying its motion for a preliminary injunction prohibiting Appellees from further use of their mark UTAH MAMMOTH and accompanying logo of a mammoth's head (the "Accused Mark and Logo"). Mammoth Hockey timely filed a notice of appeal on December 31, 2025 (App. Vol. 12 at 2997-98) in response to the District Court's order on December 23, 2025 (App. Vol. 12 at 2996). This Court has jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(a).

1

## STATEMENT OF ISSUES PRESENTED

1. Whether the District Court erred as a matter of law by applying a forward confusion analysis to determine likelihood of confusion between the parties' marks and logos, which disregarded the appropriate inquiry into Appellees' intent to infringe and the commercial strength of the marks in a reverse confusion case.

2. Whether the District Court abused its discretion by finding Mammoth Hockey failed to show a likelihood of confusion between the parties' marks and logos despite the similarity between the marks, Appellees' intent to infringe, the public's actual confusion, the similarity between the parties' products and manner of marketing, and the strength of the marks.

3. Whether the District Court abused its discretion by finding that Mammoth Hockey failed to show irreparable harm despite a presumption of irreparable harm where there is a likelihood of success on the merits and the nature of harm suffered in a reverse confusion case.

## STATEMENT OF THE CASE

Since 2014, Mammoth Hockey has manufactured and sold hockey-related goods, including durable hockey bags, bearing its Mark and Logo. App. Vol. 4 at 765-80 (¶¶ 1-44), 786-1002; App. Vol. 5 at 1003-1187.

4911-9953-0642.v2

  

While the Mark and Logo are not registered with the United States Patent and Trademark Office ("USPTO"), Mammoth Hockey was the first to commercially use them eleven years ago and continues to commercially use them today. *Id.* Mammoth Hockey's first and continued commercial use of the Mark and Logo establishes its common law trademark rights to the Mark and Logo in forty-seven states, including Utah.

Appellees are the owners of the new National Hockey League ("NHL") team in Utah, which entered the NHL last season under the name "Utah Hockey Club." App. Vol. 5 at 1189-90 (¶¶ 3-4, 10), 1245-50. Appellees announced before last season that they would change their team's name before the current season, and that their fans would decide the team's new name by voting on twenty options. App. Vol. 5 at 1189-90 (¶¶ 5, 7-8), 1197-1239. In April and May 2024, Appellees applied to the USPTO for the trademark rights to all twenty names, including UTAH MAMMOTH, and opened voting to the fans. App. Vol. 5 at 1189-90 (¶ 6), 1228-1232.

By January 2025, the USPTO had systematically rejected Appellees' applications for trademarks on many of the team's potential new names because of their likelihood of confusion with existing registered trademarks, including fan-

4911-9953-0642.v2

favorite UTAH YETI. App. Vol. 5 at 1190-91 (¶¶ 9, 11-13), 1193-94 (¶ 23), 1240-44; App. Vol. 6 at 1251-1538; Vol. 7 at 1539-1676, 1726-29. As a result, Appellees engaged "extensively" with Yeti Holdings, Inc. ("Yeti"), the maker of highly durable coolers, to negotiate their use of the YETI mark, but to no avail. App. Vol. 5 at 1191-92 (¶¶ 14-15); App. Vol. 7 at 1677-1687. On January 29, 2025, Appellees finally "moved on" from YETI because merchandise bearing the team's new name had to be "ready to go" when they announced the team's new name before the NHL season. App. Vol. 5 at 1192 (¶¶ 16-18); App. Vol. 7 at 1677-1684, 1688-1702.

In February 2025, seven months before the start of the NHL season, Appellees made inquiries about Mammoth Hockey's Mark and Logo to a professional hockey player who had sponsored Mammoth Hockey when it launched the Mark and Logo in 2014. App. Vol. 4 at 780-81 (¶ 45); Vol. 9 at 2195 (¶ 37). At least by then, Appellees knew of Mammoth Hockey's trademark rights to the Mark and Logo. *See* App. Vol. 9 at 2193 (¶ 31). Appellees, however, never contacted Mammoth Hockey like they did Yeti. App. Vol. 4 at 780-81 (¶ 45); App. Vol. 9 at 2195 (¶ 37). Appellees never attempted to negotiate an agreement for their use of the Mark and Logo like they did Yeti. *Id*. Instead, Appellees hid from Mammoth Hockey their intentions to use the Mark and Logo. App. Vol. 4 at 781 (¶¶ 46-47); App. Vol. 9 at 2196-98 (¶ 38-41).

4911-9953-0642.v2

In April 2025, five months before the start of the NHL season, and having not heard from Appellees, Mammoth Hockey contacted Appellees to inquire about their intentions to use the Mark and Logo. App. Vol. 1 at 10-11 (¶ 26); App. Vol. 4 at 781 (¶ 46); App. Vol. 9 at 2196 (¶ 38). Appellees falsely responded that they had not yet decided on the team's new name but would consider a "partnership" with Mammoth Hockey if they ultimately chose the Accused Mark and Logo. App. Vol. 1 at 11-12 (¶ 27); App. Vol. 4 at 781 (¶ 47); App. Vol. 9 at 2197-98 (¶ 40).

In May 2025, one week later and four months before the start of the NHL season, Appellees announced the Accused Mark and Logo as their team's new name and logo. App. Vol. 5 at 1193 (¶¶ 19-20); App. Vol. 7 at 1703-1712.



Appellees then flooded the market with hockey-related goods bearing the Accused Mark and Logo. App. Vol. 1 at 5 (¶¶ 16-17); App. Vol. 5 at 1193-94 (¶¶ 21-22, 24-25); App. Vol. 9 at 2181 (¶ 3), 2187 (¶ 23), 2189-91 (¶¶ 25-26), 2199-2204 (¶¶ 44-50), 2206 (¶ 55), 2213-16 (¶¶ 65-68), 2361-2370; App. Vol. 10 at 2371-2480.

Appellees did so primarily through extensive advertising and online sales. *Id.* Indeed, Appellees admit spending substantial "time, energy and resources" in selecting, developing and launching the Accused Mark and Logo. App. Vol. 1 at 5

(¶ 16). Appellees further admit that it took an "Ice Age worth of time" to make the vast selection of merchandise bearing the Accused Mark and Logo available to their fans. App. Vol. 5 at 1193 (¶ 21); App. Vol. 7 at 1713-1722.

As a result of Appellees' saturation of the market with the Accused Mark and Logo, consumers have experienced actual confusion, including with respect to the source of the parties' respective goods, as well as the mistaken belief that Mammoth Hockey and Utah Mammoth are affiliated with one another. App. Vol. 4 at 783 (¶¶ 51-53); App. Vol. 5 at 1194 (¶¶ 24-25); App. Vol. 7 at 1726-29; App. Vol. 8 at 2000-2008; App. Vol. 11 at 2895-902 (¶¶ 36-37), 2918-19; App. Vol. 12 at 2920-39. For example, on October 6, 2025, Mammoth Hockey received a customer message submitted through Mammoth Hockey's website stating:

> I am hosting my family for Christmas this year and would like to purchase 11 tickets for the Mammoth Hockey game on Sunday December 21st. I can only purchase a max of 10 tickets on-line and would like the seats together. There are 4 children. Can you help me with this?

App. Vol. 11 at 2918-19.

Appellees' conduct is a classic example of trademark infringement by "reverse confusion." Reverse confusion occurs when a larger, more powerful "junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior

user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 474-75 (3d Cir. 1994); *see also Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 127 (11th Cir. 2022); *Big O Tire Dealers, Inc., v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir. 1977).

In June and July, 2025, Mammoth Hockey advised Appellees that their conduct infringed Mammoth Hockey's established trademark rights. App. Vol. 5 at 1194-95 (¶¶ 27-30); App. Vol. 8 at 1980-1999. In August 2025, Appellees commenced this action for a declaratory judgment of non-infringement. App. Vol. 1 at 1-38. In September 2025, Mammoth Hockey asserted counterclaims of trademark infringment by reverse confusion (App. Vol. 1 at 39-272; App. Vol. 2 at 273-483; App. Vol. 3 at 484-733), and moved for a preliminary injunction enjoining Appellees from further infringement. App. Vol. 4 at 734-1002; App. Vol. 5 at 1003-1250; App. Vol. 6 at 1251-1538; App. Vol. 7 at 1539-1780; App. Vol. 8 at 1781-2075; App. Vol. 9 at 2076-2112.

In December 2025, the District Court denied Mammoth Hockey's motion for a preliminary injunction without oral argument or evidentiary hearing. App. Vol. 12 at 2971-96. The District Court held that Mammoth Hockey is likely to succeed in proving it has a "protectable trademark" as a result of Mammoth Hockey's first and continued commerical use of its Mark and Logo in the United States. App. Vol. 12

4911-9953-0642.v2

at 2976-77. The District Court further held that Mammoth Hockey was likely to succeed in proving Appellees used a similar mark in commerce when it began selling hockey-related goods bearing the Accused Mark and Logo in May 2025. App. Vol. 12 at 2977.

The District Court, however, held that Mammoth Hockey was unlikely to succeed in proving a "likelihood of confusion" between the parties' marks and logos by applying a traditional forward confusion analysis even though Mammoth Hockey alleges infringement by reverse confusion. App. Vol. 12 at 2977-91. As a result, the District Court disregarded the appropriate inquiry into Appellees' intent to infringe and the commercial strength of the parties' marks in a reverse confusion case. App. Vol. 12 at 2982-84, 2988-91. Had the District Court applied a reverse confusion analysis, it would have found a likelihood of confusion given the similarity between the marks, Appellees' intent to infringe, the public's actual confusion, the similarity between the parties' products and manner of marketing, and the strength of Appellees' mark. The Court would also have found Mammoth Hockey likely to succeed on the merits of its trademark infringment claim, which creates a presumption of irreparable harm.

## SUMMARY OF THE ARGUMENT

The District Court erred for three reasons. First, the District Court applied incorrect standards in analyzing the "likelihood of confusion." Although this is a

4911-9953-0642.v2

case of "reverse confusion," the District Court incorrectly applied factors used in typical forward confusion cases with respect to its analyses of: (i) the Appellees' intent in adopting the Accused Mark and Logo, and (ii) the commercial strength of the mark at issue. Clear error exists here because the District Court applied the wrong legal standards in assessing these factors in a reverse confusion case.

Second, it was clear error for the District Court to conclude that the evidentiary record does not support a finding of likelihood of confusion. The record evidence definitively establishes that most, if not all, of the Tenth Circuit's factors for evaluating likelihood of confusion in a reverse confusion case favor Mammoth Hockey. These include the similarity between the marks, Appellees' culpable and bad faith conduct in adopting the Accused Mark and Logo, the evidence of actual confusion, the commercial strength of Appellees' UTAH MAMMOTH mark and logo, and the fact that the parties sell similar hockey equipment bags through similar online channels. Clear error exists here because the record evidence contradicts the District Court's assessment of the relevant factors and its overarching conclusion that the factual record does not support a finding of likelihood of confusion.

Third, the District Court erred in concluding that Mammoth Hockey has not established irreparable harm in the absence of an injunction. Because Mammoth Hockey is likely to succeed on its claims of trademark infringement once the appropriate factors for likelihood of confusion in a reverse confusion case are

9

properly applied, its irreparable harm is presumed under the Trademark Modernization Act. The District Court further erred because the harm in this reverse confusion case involves Mammoth Hockey's loss of control over its business reputation and damage to its goodwill, which are cognizable irreparable harms in the trademark infringement context.

## THE STANDARD OF REVIEW

A preliminary injunction is appropriate if the moving party establishes: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm …; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *Instructure, Inc. v. Canvas Techs., Inc.*, 2022 U.S. Dist. LEXIS 2822, at *27 (D. Utah Jan. 5, 2022). The party seeking a preliminary injunction must show its entitlement to the relief is "clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).[1]

---

[1] For certain disfavored preliminary injunctions, including those which alter the status quo, a movant has a heightened burden of proving the factors weigh "heavily and compellingly" in its favor. *Dominion Video Satellite, Inc.*, 269 F.3d at 1154. The status quo to be considered is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Id.* (quoting *SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991)). Here, a preliminary injunction requiring Appellees to revert back to using "Utah Hockey Club" – the last uncontested status quo between the parties – will not require Appellees "to do something it was not already doing during the last uncontested period." *Id.* at 1155. Accordingly, a mandatory injunction was not required, and the

4911-9953-0642.v2

In the Tenth Circuit, "likelihood of confusion is a question of fact subject to the clearly erroneous standard of review." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 923 n.2 (10th Cir. 1986). On the other hand, misapplication of the relevant standards is a question of law subject to *de novo* review. *Id.* If "the district court's decision rests primarily upon a legal conclusion . . . the appellate court's review is plenary." *United States v. Hopkins*, 235 Fed. Appx. 693, 700 (10th Cir. 2007) (quoting *United States v. Wolfe*, 435 F.3d 1289, 1295 (10th Cir. 2006)).

This Court may also find a lower court's decision clearly erroneous where it "has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1152 (10th Cir. 2012) (quoting *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1235 (10th Cir. 2001)). "A finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Naimie v. Cytozyme Labs., Inc.*, 174 F.3d 1104, 1112 (10th Cir. 1999) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 565 (1985)).

---

District Court properly decided the motion under the "lower, prohibitory standard". App. Vol. 12 at 2975-76.

4911-9953-0642.v2

# ARGUMENT

Mammoth Hockey has asserted claims against Appellees for, among other things, trademark infringement under Section 43 of the Lanham Act (15 U.S.C. § 1125). App. Vol 1 at 55-56 (¶¶ 43-50). To succeed on its claim for trademark infringement, Mammoth Hockey must demonstrate: (1) it has a protectable mark; (2) Appellees have used an identical or similar mark in commerce; and (3) Appellees' use of the mark creates a likelihood of confusion by consumers. *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 n.60 (D. Utah 2020).

There is no reasonable dispute that Mammoth Hockey has satisfied the first two legal elements for trademark infringement. The District Court properly found "it is undisputed that Mammoth Hockey has been continuously using the Marks since 2014 to sell hockey-related goods in most of the United States and Canada," and therefore the court concluded Mammoth Hockey is likely to succeed in proving it possesses a protectable trademark. App. Vol. 12 at 2976-77. The District Court also properly found that Mammoth Hockey is likely to succeed in proving that Appellees are using a similar or identical mark in commerce, as Appellees do not contest this point. App. Vol. 12 at 2977.

4911-9953-0642.v2

## I.  The District Court Committed Legal Error by Applying Traditional Forward Confusion Factors in a Reverse Confusion Case

### A.  "Reverse" And "Forward" Confusion

This Court has long recognized that consumer confusion in trademark infringement cases can arise in several forms, including "forward" confusion (also known as "direct" confusion) and "reverse" confusion. *See 1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1238-39 (10th Cir. 2013). Forward or direct confusion occurs when consumers "develop the mistaken belief that the plaintiff is the origin of the defendant's goods or services—so that the defendant capitalizes on the plaintiff's good name." *Id.* at 1238. The classic case of direct confusion occurs when "[c]ustomers want to buy the [plaintiff's] product and because of the similarity of the marks, mistakenly buy the [defendant's] product instead." *Id.*

In contrast, reverse confusion typically occurs "when the [junior user's] advertising and promotion so swamps the [senior user's] reputation in the market" that "customers purchase the [junior user's] goods under the mistaken impression that they are getting the goods of the [senior user]." *Id.* at 1239 (quoting 4 McCarthy § 23:10 at 23-70-71). Reverse confusion also arises where there is a "mistaken belief in common sponsorship or affiliation" of the senior user and the junior user of similar marks. *Id.*

4911-9953-0642.v2

Notably, in reverse confusion cases, the defendant is not "trying to take a free ride on the [senior user's] reputation" – as is the case in forward confusion – but instead "would drown out the value of the [senior user's] mark." *Id.*

**B. This Is a Classic Case of Reverse Confusion**

The paradigm case of reverse confusion occurs when the junior user is a larger company which, prior to its nationwide launch and adoption of a new mark, discovers a smaller business, often operating in one locality, that has been using a very similar mark in a related field for many years. *Id.*; McCarthy § 23:10 at 23-1. The evidence in the record, including Appellees' own admissions, establishes this is a classic case of reverse confusion.

Appellees admit that, prior to adopting and publicly launching the Accused Mark and Logo as the new brand for their NHL hockey team and merchandise in May 2025, they were aware that Mammoth Hockey had used its Mark and Logo to sell hockey bags and related goods since 2014. App. Vol. 4 at 780-81 (¶ 45); App. Vol. 9 at 2193 (¶ 31); 2195 (¶ 37). Appellees however did not reach out to Mammoth Hockey to discuss the Mark, despite having obtained Mammoth Hockey's contact information. App. Vol. 4 at 780-81 (¶¶ 45-46); App. Vol. 9 at 2195 (¶ 37). When Mammoth Hockey instead contacted Appellees in late April 2025 to inquire as to which new mark they intended to choose for their NHL hockey team, Appellees *admittedly* made false statements to conceal that they were just days away from

announcing their adoption of the Accused Mark and Logo. App. Vol. 1 at 10-12 (¶¶ 26-27); App. Vol. 4 at 781 (¶¶ 46-47); App. Vol. 9 at 2196-98 (¶¶ 38-41).

Just days later on May 7, 2025, Appellees launched "with great fanfare" a nationwide advertising campaign announcing their adoption of the Accused Mark and Logo for their NHL hockey team and merchandise, which was the subject of substantial media coverage. App. Vol. 1 at 5 (¶ 16); App. Vol. 5 at 1193 (¶¶ 20-22); App. Vol. 7 at 1709-25; App. Vol. 9 at 2181 (¶ 3), 2187 (¶ 23), 2189-91 (¶¶ 25-26), 2361-2370. Appellees spent substantial "time, energy and resources" in selecting, developing and launching the Accused Mark and Logo. App. Vol. 1 at 5 (¶ 16).  Since their adoption of the Accused Mark, Appellees and/or their exclusive licensees have used the Accused Mark and Logo extensively to market, offer, advertise and promote goods and services relating to their NHL hockey team.  App. Vol. 1 at 5 (¶ 17); App. Vol. 9 at 2181 (¶ 3); at 2199-2204 (¶¶ 44-50). Notably, Appellees advertise and market goods bearing the Accused Mark and Logo through local and national media, and also "benefit from news coverage of games and other team activities." App. Vol. 9 at 2206 (¶ 55), 2213-15 (¶¶ 65-67). The NHL and its sponsors also advertise and promote the Accused Mark and Logo. App. Vol. 9 at 2215 (¶ 68).

As a result of Appellees' use of the Accused Mark and Logo, there is a likelihood of confusion. Indeed, consumers have already experienced actual confusion, including with respect to the source of the parties' respective goods, as

well as the mistaken belief that Mammoth Hockey and Utah Mammoth are affiliated with one another.  *See* Section III(C) *infra*.

### C. The District Court Erred by Applying a Forward Confusion Analysis

Because this a reverse confusion case, the analysis and application of the likelihood-of-confusion factors differs somewhat from traditional forward confusion cases. *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 127 (11th Cir. 2022) ("Because both the harm and the theory of infringement in a reverse-confusion case differ from what is claimed in a forward-confusion case, the analysis and application of the ... likelihood-of-confusion factors differ as well"); *see also Collectable Promotional Prods. v. Disney Enters.*, 2009 U.S. Dist. LEXIS 46775, at *36 (W.D. Okla. June 2, 2009) (agreeing with plaintiff that "application of the likelihood of confusion factors differs somewhat in a reverse confusion case").

The District Court however erred by applying traditional "forward" confusion factors to assess the likelihood of confusion here, including with respect to analyzing (i) Appellees' "intent" in adopting the Accused Mark and Logo (App. Vol. 12 at 2982-83), and (ii) the relative strength or weakness of the respective marks. App. Vol. 12 at 2990.

4911-9953-0642.v2

*1. A Forward Confusion "Intent" Inquiry in a Reverse Confusion Case Is Contrary to The Decisions of Several Courts of Appeals and District Courts Within this Circuit*

In a typical forward confusion case, the factor of "intent" is analyzed to determine whether a smaller, junior user intended to derive benefit from a larger, senior user's "already-established reputation or goodwill." *Altira Group LLC v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1199 (D. Colo. 2002). But because this is a reverse confusion case where the harm alleged is different – that Appellees, larger junior users overwhelmed the smaller Mammoth Hockey's name through their widespread national advertising campaign of the Accused Mark and Logo – Mammoth Hockey argued below that a different intent inquiry is appropriate (App. Vol. 12 at 2982), which looks to whether the larger junior user Appellees "acted carelessly or otherwise culpably in selecting the allegedly infringing name." *Altira Group LLC*, 207 F. Supp. 2d at 1200.

Although this Circuit has not yet directly decided the issue of whether a different intent inquiry should apply in reverse confusion cases, numerous Courts of Appeals and two District Courts within this Circuit have held that the standard propounded by Mammoth Hockey is the appropriate intent inquiry in reverse confusion cases. *Wreal, LLC*, 38 F.4th at 136; *Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 934-35 (9th Cir. 2017); *GrubHub Inc. v. Relish Labs LLC*, 80 F.4th 835, 857 (7th Cir. 2023); *Fisons Horticulture , Inc. v. Vigoro Indus., Inc.*, 30 F.3d

466, 479-80 (3d Cir. 1994); *Altira Group LLC*, 207 F. Supp. 2d at 1200; *Collectable Promotional Prods. v. Disney Enters.*, 2009 U.S. Dist. LEXIS 46775, at *36 (W.D. Okla. June 2, 2009).

Against the weight of this precedent, the District Court nevertheless determined that the intent inquiry traditionally applied in forward confusion cases must also be applied in reverse confusion cases. App. Vol. 12 at 2982-83. The District Court stated that its ruling followed this Circuit's precedent in *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1532 (10th Cir. 1994), and pointed out that, although *Universal* involved reverse confusion, the Circuit did not apply a different intent standard there, but stated that the "proper focus remains whether defendant had intent to derive benefit from the reputation or goodwill of plaintiff." App. Vol. 12 at 2982. Applying that standard here, the District Court found it "unlikely" that the Utah Mammoth hockey team "sought to benefit from a small business's goodwill," and therefore held the intent factor weighed in favor of Appellees. App. Vol. 12 at 2982-83.

The District Court's decision is not only contrary to the weight of authority, it is directly at odds with the decision of another court in this Circuit. The court in *Altira Group LLC v. Philip Morris Cos.*, 207 F. Supp. 2d 1193 (D. Colo. 2002), after considering the same precedent as the District Court, reached the exact opposite conclusion. That court found that "intent to derive benefit from the senior user's

4911-9953-0642.v2

mark is the incorrect standard in reverse confusion cases," and that "the appropriate intent inquiry is whether defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name." *Altira Group LLC*, 207 F.Supp.2d at 1200.

The *Altira* court found that the Tenth Circuit's decision in *Universal Money Centers* did not compel a different conclusion, as that case simply adopted the forward confusion standard without analysis or explanation. *Id.* The *Altira* court further reasoned that requiring a plaintiff in a reverse confusion case to prove that the defendant junior user intended to trade on plaintiff's goodwill and reputation was inconsistent with the concept of reverse confusion recognized by the Tenth Circuit in *Big O Tire*. *Altira Group LLC*, 207 F. Supp. 2d at 1200 (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.* 561 F.2d 1365, 1372 (10th Cir. 1977) (noting this Court rejected the argument that liability for trademark infringement could not be imposed "without a showing that [the junior user] Goodyear intended to trade on the goodwill of [the senior user] Big O or to palm off Goodyear products as Big O's")). Another court within this Circuit seemed to agree with the *Altira* court's holding and rationale in *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1247 n.122 (D. Utah 2020).[2]

---

[2] In *Equitable*, the court noted that, although this Circuit has not specifically addressed whether the intent prong should be analyzed differently in reverse confusion cases, the holding of *Big O* would support a finding that proof of intent to derive benefit from the reputation or goodwill of the plaintiff is not the proper inquiry in reverse confusion cases. *Id.* The Court there however refused to consider

4911-9953-0642.v2

"To the extent reverse confusion is actionable under the Lanham Act and common law generally, proof of forward confusion cannot be a necessary element to recovery. To hold otherwise, as the Tenth Circuit acknowledged in *Big O*, would permit 'anyone with adequate size and resources [to] adopt any trademark and develop a new meaning for that trademark as identification of [its] products." *Altira Group LLC*, 207 F. Supp. 2d at 1200 (quoting *Big O Tire*, 561 F.2d at 1372).

The District Court therefore erred by failing to properly analyze Appellees' intent under the appropriate standard in reverse confusion cases to determine whether they acted carelessly or culpably in adopting the Accused Mark and Logo.

### 2. There Is No Initial Burden to Prove Market Saturation Through Sales Data and Market Share

The District Court also refused to conduct an inquiry into Appellees' bad faith and/or culpable conduct in selecting the Accused Mark and Logo on the grounds that "[w]hile market saturation is a mainstay of reverse-confusion cases, Mammoth Hockey has failed in its burden as the movant to prove that [Appellees] have flooded the market." App. Vol. 12 at 2983. Specifically, the District Court found that Mammoth Hockey "provided no market-share or sales data or unrebutted evidence

---

applying the reverse confusion intent inquiry because the plaintiff did not raise the issue of a reverse confusion claim until its reply brief. *Id.*

to support its claim that [Appellees] have 'saturated the market' of hockey-related goods with the Accused Marks." App. Vol. 12 at 2983.

But there is no precedent establishing any prerequisite that a party must first prove market saturation by sales or market share data before reverse confusion factors may be used to determine whether there is a likelihood of confusion – and the District Court cites to none. That is because, in reverse confusion cases, the focus of market saturation is not on the amount of sales of goods bearing an allegedly infringing mark. Rather, the focus of market saturation is on determining whether a junior user with greater economic power (Appellees) saturated the market with *advertising* of a confusingly similar mark, thereby drowning out the value of the senior user's Mammoth Hockey Mark. *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1239 (10th Cir. 2013) ("Reverse confusion typically occurs 'when the [defendant's] *advertising and promotion* so swamps the [plaintiff's] reputation in the market" that "customers purchase the [defendant's] goods under the mistaken impression that they are getting the goods of the [plaintiff]") (quoting 4 McCarthy on Trademarks § 23:10 at 23-70) (emphasis added); *Big O Tire*, 561 F.2d 1365 ("The logical consequence of accepting Goodyear's position would be the immunization from unfair competition liability of a company with . . . the *economic power to advertise extensively* for a product name taken from a competitor") (emphasis added); *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 127 (11th Cir. 2022) (noting

the paradigm case of reverse confusion is "a knowing junior user with much greater economic power who saturates the market *with advertising* of a confusingly similar mark") (emphasis added).

As set forth in Section I.B above, this is precisely what Appellees candidly admit they did: that beginning on May 7, 2025, they saturated the market with advertising and promotion of their announcement that they had adopted the Accused Mark and Logo for their NHL hockey team, which was the subject of substantial media coverage. Since that time, Appellees and their licensees – including the NHL– have advertised and promoted goods bearing the Accused Mark and Logo through national and local media, social media and online. The evidence thus clearly establishes that Appellees used their superior economic power to saturate the market with advertising and promotion of the Accused Mark and Logo, and thus the appropriate reverse confusion factors should be applied to assess the likelihood of confusion.

### 3. The District Court Erred by Failing to Apply a Reverse Confusion Inquiry for Assessing the Strength of the Mark

In a typical forward confusion case, the analysis of the strength of the mark focuses on the conceptual strength of the senior user's mark. *Wreal, LLC*, 38 F.4th at 128. But in a reverse case, the plaintiff is not arguing that the defendant is attempting to profit off the plaintiff's goodwill, but rather that a junior but more powerful mark user has been able "to commercially overwhelm the market and

saturate the public conscience with its own use of the mark, thereby weakening and diminishing the value of the senior user's mark." *Id*. at 128-29. In such cases, "the conceptual strength of the plaintiff's mark is necessarily less important to the analysis" and the court "should consider both the conceptual strength of the plaintiff's mark and the relative commercial strength of the defendant's mark." *Id*. at 129; *Altira Group LLC*, 207 F. Supp. 2d at 1203 ("The more sensible analysis in reverse confusion cases is to analyze the strength of the junior user's mark in order to determine its ability to overpower that of the senior user"); *Collectable Promotional Prods. v. Disney Enters.*, 2009 U.S. Dist. LEXIS 46775, at *38 (W.D. Okla. June 2, 2009) (holding that in a reverse confusion case, "the relevant inquiry is whether the junior user's mark has sufficient commercial strength to overwhelm the senior user's mark").

The District Court did not apply this reverse confusion standard here to assess the strength of the mark, but once again used the typical forward confusion standard. Rather than analyzing whether the junior users' (Appellees') Utah Mammoth mark had sufficient commercial strength to overwhelm and overpower Mammoth Hockey's Mark, the District Court instead assessed the commercial strength of the *senior user* Mammoth Hockey's Mark. App. Vol. 12 at 2990. Focusing on the sales and advertising of Mammoth Hockey, the District Court noted that the evidence did not "show a large sales volume," and that while Mammoth Hockey made "some

effort at advertising" there was insufficient information concerning "context and specifics." App. Vol. 12 at 2990-91. Based on this analysis, the court below concluded that Mammoth Hockey did not meet its burden of proving the commercial strength of *its* Mark. *Id.* at 2991.

By focusing its analyses on the commercial strength of the senior user's Mammoth Hockey Mark, rather than on the commercial strength of the junior users Appellees' Accused Mark, the District Court applied the wrong legal standards.

## II. THE DISTRICT COURT COMMITTED CLEAR ERROR IN FINDING THERE IS NO LIKELIHOOD OF CONFUSION BETWEEN THE PARTIES' MARKS AND LOGOS

The District Court stated that the "central inquiry" on Mammoth Hockey's motion for a preliminary injunction was "the likelihood of consumer confusion" but concluded that Mammoth Hockey "has not shown a likelihood of confusion." App. Vol. 12 at 2976, 2991. In reaching this conclusion, the court evaluated six factors this Court has identified for assessing whether a likelihood of confusion exists between two marks:

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks."

App. Vol. 12 at 2977 (quoting *Sally Beauty Co., Inc. v. Beautyco*, Inc., 304 F.3d 964, 972 (10th Cir. 2002)).

A review of the District Court's analysis of these factors here demonstrates the court committed clear error in its evaluation of several of the factors and in also with respect to its ultimate conclusion regarding the likelihood of confusion.

## A. The Accused Mark and Logo Are Extremely Similar to Mammoth Hockey's Mark and Logo

The similarity of the marks is tested on three levels as encountered in the marketplace: sight, sound, and meaning. *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1246 (D. Utah 2020). In examining these elements, the court "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark." *Id.* (citations omitted). "[S]imilarities between marks should be given more weight than differences." *Universal Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1531 (10th Cir. 1994). "Although the similarity of the marks is measured by the marks in their entireties, it is proper to give greater force and effect to the dominant portions of the parties' marks." *Sara Lee Corp. v. Sycamore Family Bakery*, 2009 U.S. Dist. LEXIS 100554, at *8 (D. Utah Oct. 27, 2009).

As to sight and sound, the dominant portions of the parties' respective marks at issue are nearly identical: the word "MAMMOTH," in all capital letters, and both are accompanied by the logo of a mammoth's head. App. Vol. 12 at 2978. In MAMMOTH HOCKEY, the word "HOCKEY" is merely descriptive of the type of goods sold. App. Vol. 7 at 1576-79 (USPTO denying Appellees' application to

25

register "UTAH VENOM," finding that the dominant word in that mark was "VENOM," which conflicted the dominant word in an already registered mark, "VENOM HOCKEY," where the term "HOCKEY" was disclaimed as merely descriptive of or generic for a party's goods and/or services, therefore leaving the dominant term of both marks as "VENOM"); *see also Sara Lee Corp.*, 2009 U.S. Dist. LEXIS 100554 at *8 (finding the words "Bakery" and "Home Maid Bread" had nominal commercial significance and do not serve to distinguish the goods). In "UTAH MAMMOTH," "UTAH" is not a dominant part of the mark as it is merely descriptive of the origin of the goods sold, which is why the USPTO denied Appellees' application to register the mark unless it first disclaimed the word "UTAH." App. Vol. 8 at 1942-43.

The District Court acknowledged that the "dominant portions of the competing trademarks" share similarities, as "both display 'MAMMOTH' in all capital letters and use a similar, blocky font," and both are accompanied by a logo of a mammoth's head. App. Vol. 12 at 2978-79. Nevertheless, the District Court ultimately determined that there were differences in the two marks that outweighed the similarities, including with respect to a comparison of their font colors; the angle and axis of the fonts; and the color, orientation and styling of the two mammoth logos. App. Vol. 12 at 2979.

4911-9953-0642.v2

But the test is not whether the marks and logos are identical when viewed side by-side, but rather whether they "confuse the public when singly presented." *Sally Beauty Co.*, 304 F.3d at 972. When viewed as a whole, the marks in this case have "significant stylistic overlap." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019). As the District Court found, both have the same dominant word taking up half of the total text, "both display 'MAMMOTH' in all capital letters and use a similar, blocky font." App. Vol. 12 at 2979. Furthermore, both marks contain logos of a mammoth's head, although oriented in opposing directions. Under strikingly similar circumstances, this Court found that, "because '[w]e give the similarities of the marks more weight than the differences,' there are sufficient similarities in the marks to weigh" in favor of the senior user. *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112 at 1115 (quoting *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999)).

The District Court itself acknowledged that the dominant portions of the marks are similar (App. Vol. 12 at 2978-79), but then failed to "give greater force and effect to the dominant portions of the parties' marks." *Sara Lee Corp.*, 2009 U.S. Dist. LEXIS 100554, at *8. When viewed in their entireties, "with the non-dominant features appropriately discounted," the parties' marks are nearly identical in appearance and will confuse the public when singly presented. *Id.*; *see also Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1247 (finding that where both marks

consisted of the identical and dominant word, "consumers are unlikely to divine significant differences in the marks' meanings").

The District Court further erred by failing to acknowledge that when viewed as to sound, the dominant part of the parties' marks "MAMMOTH" is pronounced identically. Finally, it is self-evident that the identical words "MAMMOTH" have the same meaning. Thus, the similarity of the parties' marks favors Mammoth Hockey.

### B. Appellees Took Mammoth Hockey's Mark in Bad Faith

As set forth above, in reverse confusion cases, "the appropriate intent inquiry is whether defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name." *Altira Group LLC*, 207 F. Supp. 2d at 1200 (emphasis added); *see also Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1247 n.122; *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1167-1168 (9th Cir. 2021). The requisite intent can be shown by a wide variety of conduct:

> At one extreme, intent could be shown through evidence that a defendant deliberately intended to push the plaintiff out of the market by flooding the market with advertising to create reverse confusion. Intent could also be shown by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the [mark], failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion.

*Wreal, LLC*, 38 F.4th at 136 (quoting *Marketquest Group, Inc. v. BIC Corp.*, 862 F.3d 927, 934-35 (9th Cir. 2017)). Other questions the courts consider are whether the

4911-9953-0642.v2

party conducted an adequate name search for other companies marketing similar goods under similar names; whether it followed through with its investigations; whether it attempted to contact companies using a similar mark; and whether the party was careless in its evaluation of the likelihood of confusion. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 480 (3d Cir. 1994).

The District Court's analysis did not evaluate Appellees' intent pursuant to the foregoing standards, because it erroneously applied the forward confusion factor of intent. The record evidence nonetheless clearly establishes that Appellees' actions in taking the Accused Mark and Logo was the epitome of bad faith and culpable conduct.

Appellees admit that, prior to adopting and publicly launching the Accused Mark and Logo as the new brand for their NHL hockey team and merchandise in May 2025, they were aware that Mammoth Hockey had used its Mark and Logo to sell hockey bags and related goods since 2014. App. Vol. 4 at 780-81 (¶ 45); App. Vol. 9 at 2193 (¶ 31), 2195 (¶ 37). Appellees admit they did not reach out to Mammoth Hockey to discuss the Mark, despite having obtained Mammoth Hockey's contact information. App. Vol. 4 at 780-81 (¶¶ 45-46); App Vol. 9 at 2195 (¶ 37). When Mammoth Hockey instead contacted Appellees in late April 2025 to inquire as to which new mark they intended to choose for their NHL hockey team, Appellees admittedly made *false statements* to conceal that they were just days away from

announcing their adoption of the Accused Mark and Logo. App. Vol. 4 at 781 (¶¶ 46-47); App. Vol. 1 at 10-12 (¶¶ 26-27); App. Vol. 9 at 2196-98 (¶¶ 38-41). They then flooded the market on May 7, 2025, with advertising and promotion of the Accused Mark and Logo, including merchandise Appellees acknowledged typically takes substantial lead times of 6 to 18 months to develop, produce and ship (although the timing for the production of these goods was "significantly condensed" given the limited amount of time until the beginning of the next hockey season). App. Vol. 1 at 5-6 (¶¶ 16-17); Vol. 5 at 1193 (¶¶ 20-22); App. Vol. 7 at 1709-25; App. Vol. 9 at 2181 (¶ 3), 2187 (¶ 23), 2189-91 (¶¶ 25-26), 2199-2204 (¶¶ 44-50), 2361-2370.

Accordingly, Mammoth Hockey is likely to succeed in establishing the intent factor of likelihood of confusion. *See Wreal, LLC*, 38 F.4th at 137; *Fisons,* 30 F.3d at 480; *Ironhawk Techs., Inc.*, 2 F.4th at 1168 (holding that, where junior user knew of the senior's mark before it publicly launched its new accused mark, a reasonable jury could find the junior user "culpably disregarded the risk of reverse confusion"); *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1132 (9th Cir. 1998) (reversing grant of summary judgment and remanding for trial where "[c]ounsel for DreamWorks conducted a diligent search and discovered the Dreamwerks mark, yet failed to make accommodations or select a different mark"); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013)) (finding culpability alleged where defendants "had knowledge of [the] mark, liked it, and decided to use it as their own.").

4911-9953-0642.v2

## C. Appellees' Use of the Accused Mark and Logo Has and Will Cause Actual Confusion

While evidence of actual confusion is not required, it is often considered the best evidence of likelihood of confusion. *Instructure, Inc. v. Canvas Tech., Inc.*, 2022 U.S. Dist. LEXIS 2822, at *37 (D. Utah Jan. 5, 2022). "But, because evidence of actual confusion can be difficult to obtain, its absence is generally unnoteworthy and is given little probative weight." *Id.* Particularly because the Accused Mark has been in commerce "for only a short time, evidence of actual confusion is particularly apt to be unavailable and its absence . . . is understandable." *Packerware Corp. v. Corning Consumer Prods., Co.*, 895 F. Supp. 1438, 1451 (D. Kan. 1995).

Nevertheless, at this early stage of the proceedings, the evidence of actual confusion is more than sufficient to establish Mammoth Hockey is likely to succeed on its infringement claims. The District Court erred in concluding that the evidence in the record "does not suggest much actual confusion," because it improperly discounted, and excluded, compelling evidence of actual confusion submitted by Mammoth Hockey, and also gave weight – albeit limited weight – to fatally flawed survey evidence submitted by Appellees. App. Vol. 12 at 2984-86.

The evidence of actual confusion submitted by Mammoth Hockey was not, as the court described "isolated" or merely limited to "anecdotal evidence." App. Vol. 12 at 2985-86. Mammoth Hockey submitted proof that, prior to Appellees' use of the Accused Mark and Logo, an internet search for "mammoth hockey bags" would

31

yield as its first result Mammoth Hockey's website, where it has marketed and sold

its hockey-related goods bearing the Mark and Logo since 2014. App. Vol. 4 at 772

(¶ 24). Since Appellees saturated the market with the Accused Mark and Logo, the

results for "mammoth hockey bags" now include a number of "sponsored"

advertisements for several different websites from which customers can purchase

Utah Mammoth hockey bags. App. Vol. 5 at 1194 (¶¶ 24-25); App. Vol. 7 at 1726-

29. Notably, in those search results, directly underneath the advertisements for Utah

Mammoth's hockey bags is the link for Mammoth Hockey's website, which gives

the false impression that the companies and their goods are connected. App. Vol. 5

at 1194 (¶¶ 24-25); App. Vol. 7 at 1726-29. Consumers have independently publicly

confirmed the internet search confusion that arises from the Appellees' use of a

similar a mark to Mammoth Hockey's Mark.[3]

---

[3] App. Vol. 12 at 2929 (Reddit Post by "EMTDAWG": "Try typing 'mammoth hockey' into Google. They went from the 1st search result (prior to Utah taking the name) to not on the 1st 10 pages of results when I tried it after the lawsuit was 1st announced"), 2930 (Reddit Post by "MistaPink": "LOL Mammoth Hockey ain't wrong here. Just google searched Mammoth Hockey Bags and get blasted with Utah Mammoth Hockey bags"); App. Vol. 8 at 2005 (Reddit post by "pklym": "3. The fact that I have to use extra descriptors when I'm trying to differentiate between Mammoth Hockey (bag) and Utah Mammoth Hockey Club (NHL), kind of demonstrates the exact problem. This isn't just someone using the same creature in different contexts, it's very overlapping. What are the odds that the NHL team will use slogans, chants, or nicknames like "Mammoth Hockey" or "That's Mammoth Hockey." Well, no its not ....").

Mammoth Hockey also submitted additional evidence of actual confusion, including two separate instances of consumers inquiring whether Mammoth Hockey was affiliated with the Utah Mammoth hockey team.[4] In addition, Mammoth Hockey submitted compelling evidence of confusion experienced by customers of *both* Appellees and Mammoth Hockey: (i) an email dated October 6, 2025 that Mammoth Hockey received through its website from an obvious customer of Appellees, seeking Mammoth Hockey's assistance in purchasing eleven tickets to a Utah Mammoth hockey game (App. Vol. 11 at 2919); and (ii) a Twitter post dated November 3, 2025 by a potential customer of Mammoth Hockey, who wrote "was searching for mammoth hockey bags but ended up directed to Utah mammoth what is this?" App. Vol. 12 at 2921.

However, the District Court refused to consider this new evidence of actual confusion on the grounds that it was "belatedly" presented in Mammoth Hockey's reply papers. App. Vol. 12 at 2985 n.93. However, the evidence was not submitted "belatedly" at all – it only *came into existence weeks after* Mammoth Hockey's initial moving papers were filed in September 2025. Given how much weight the court

---

[4] For example, on July 14, 2025, Mammoth Hockey's principal, Mr. Olson, was wearing a t-shirt bearing the Mark and Logo after a hockey game in Beaverton, Oregon and was asked by another player whether the shirt was from Appellees' hockey team. App. Vol. 4 at 783 (¶ 52). Similarly, on September 14, 2025, a teammate of Mr. Olson conveyed that another player had asked him whether a water bottle bearing the Mark and Logo was from Appellees' hockey team. *Id.* at ¶ 53.

placed on what it characterized as the "de minimis," "isolated" and "limited" nature of Mammoth Hockey's evidence of actual confusion (App. Vol. 12 at 2986), it is respectfully submitted that this important direct evidence of customer confusion should have been considered. Any concern about Appellees' ability to rebut the new evidence could have been easily rectified at a hearing on the motion, had the District Court held one.

Finally, in reaching its conclusions with respect to actual confusion, the District Court erred by giving *any* weight to the survey evidence submitted by Appellees. App. Vol. 12 at 2984-86; *see* App. Vol. 10 at 2494-2520, 2622. Professor McCarthy has concluded that, in reverse confusion cases, Eveready surveys do not yield useful results until the Accused Mark has fully saturated the market. McCarthy § 23:10 n.32. That is because an Eveready survey does not show respondents the newer junior mark and instead simply assumes awareness, whereas here, the Accused Mark was only launched relatively recently. McCarthy § 32:174.

Moreover, Appellees' survey was fatally flawed because it surveyed the wrong customer base. The District Court found that both parties "agree that the proper universe to survey for a reverse confusion case is the senior user [Mammoth Hockey's] customer base" – which in this case was a specialized audience willing to pay between $189 to $275 on a premium hockey bag. App. Vol. 12 at 2985. Instead, Appellees' survey selected participants from the junior user *Appellees'* customer

base – those individuals willing to pay $100 for a hockey bag (App. Vol. 10 at 2504-06 (¶ 24, Ques. 65); App. Vol. 9 at 2164), which is actually the price of *Appellees'* hockey bags. App. Vol. 11 at 2839-44; App. Vol. 7 at 1726-27.

Based on these facts, the court below found the Appellees' survey evidence "to either be relatively weak or at least of unclear strength and so affords it less weight." App. Vol. 12 at 2985. But *no* weight at all should be given to the survey. "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be *irrelevant*." McCarthy § 32.162 (emphasis added); *see also J&J Snack Foods, Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 372 (D.N.J. 2002) (finding survey fatally flawed where, among other things, the universe chosen for the survey was improper).

Based on the foregoing, the evidence of actual confusion to date favors a finding of likelihood of confusion. *See Instructure, Inc. v. Canvas Tech., Inc.*, 2022 U.S. Dist. LEXIS 2822, at *37-38 (D. Utah Jan. 5, 2022) ("there is some evidence of actual confusion, which contributed to a finding of likelihood of confusion").

### D.  The Parties' Products and Manner of Marketing are Similar

"The greater the similarity between the [parties'] products, the greater the likelihood of confusion." *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir. 2002); *see also Sec. USA Servs., LLC v. Invariant Corp.*, 2023 U.S. Dist.

LEXIS 46962, at *12 (D.N.M. Mar. 20, 2023) ("Likelihood of confusion is obvious when two companies sell the same thing under the same name"). "The issue is not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both." *Instructure, Inc.*, 2022 U.S. Dist. LEXIS 2822, at *38. Here, as the District Court found, "it is undisputed that both parties sell hockey-related products, including hockey [equipment] bags." App. Vol. 12 at 2987; *see also* App. Vol. 9 at 2205-06 (¶ 54).

Moreover, it is also undisputed that both parties sell their hockey-related goods *primarily* through online sales. App. Vol. 1 at 5-6 (¶ 17); App. Vol. 4 at 771-72 (¶¶ 23-24), 808-830. This court has recognized that "the possibility of confusion is greatest when products reach the public by the same retail outlets." *Sally Beauty Co.*, 304 F.3d at 975.

Because the parties had similar and competing products marketed to consumers through similar commercial channels, this factor weighs in favor of Mammoth Hockey. *Id.* But while the District Court acknowledged that both parties sell hockey equipment bags, it focused on the fact that there were some differences in the quality and price of the parties' respective bags to conclude that "Mammoth Hockey has not shown the products are similar enough to likely cause confusion." App. Vol. 12 at 2987.

4911-9953-0642.v2

However, the "issue is not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both." *Instructure, Inc.*, 2022 U.S. Dist. LEXIS 2822 at *38. Here, given the similarity of the hockey equipment bags sold by the parties, the similarity of the marks and logos they bear, and the fact that both parties' hockey bags are being marketed and sold primarily online, this factor clearly favors Mammoth Hockey.

### E. The Conceptual Strength of the Mammoth Hockey Mark and the Commercial Strength of Appellees' Mark Show Confusion

As discussed above, the analysis of the strength of the mark in reverse confusion cases focuses less on the conceptual strength of the senior user's mark, and more on the commercial strength of the junior user's mark "in order to determine its ability to overpower that of the senior user." *Altira Group LLC v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1203 (D. Colo. 2002); *Collectable Promotional Prods. v. Disney Enters.*, 2009 U.S. Dist. LEXIS 46775, at *38 (W.D. Okla. June 2, 2009); *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 128-29 (11th Cir. 2022). Proper application and analysis of these factors clearly favor Mammoth Hockey here.

The conceptual strength of Mammoth Hockey's Mark and Logo is "arbitrary," because "it involves words and symbols that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality[,] or characteristic of those goods or services." *Affliction*

*Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019) (internal quotations omitted).

The Mark and Logo here apply the common word "mammoth" to hockey-related goods. A mammoth has no relationship to hockey, and a mammoth playing hockey is nonsensical. *Instructure*, 2022 U.S. Dist. LEXIS 2822 at *42 (finding mark arbitrary because it bears no relationship to the actual products). Thus, as an arbitrary mark, the Mark and Logo are conceptually strong. *Affliction Holdings, LLC*, 935 F.3d at 1115 ("The categories of conceptual strength in descending order are fanciful; arbitrary; suggestive; descriptive; and generic.").

Yet, the District Court reached the incorrect conclusion that Mammoth Hockey's mark is "suggestive, falling midway in the range of conceptual strength" (App. Vol. 12 at 2989). Nevertheless, "whether the mark is determined to be arbitrary or suggestive, [it] is still inherently distinctive and entitled to strong protection." *Instructure, Inc*, 2022 U.S. Dist. LEXIS 2822, at *42.

The District Court further erred by concluding that the conceptual strength of the Mammoth Hockey Mark has been eroded and is now "relatively weak" based on evidence of use of "Mammoth" by third parties in connection with sports teams and sports bags. App. Vol. 12 at 2989-90. The evidence on which the District Court relied shows however that, with the exception of Appellees, *none* of those third parties used the word and logo of a "mammoth" to commercially sell hockey-related

goods, and more particularly, hockey equipment bags. App. Vol. 10 at 2627-39. Although evidence of third-party use of a mark is admissible, "the weight to be given such evidence may be limited when the use of similar marks is not on similar goods." *Univ. of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1231-1232 (D. Kan. 2008).[5]

In any event, the focus in reverse confusion cases is less on the conceptual strength of Mammoth Hockey's mark and more on "the strength of the junior user's mark in order to determine its ability to overpower that of the senior user." *Altira Group LLC*, 207 F. Supp. 2d at 1203. Here, the commercial strength of Utah Mammoth's Accused Mark and Logo is manifest and appears in the record. Appellees admit that UTAH MAMMOTH was launched with "great fanfare" by a major advertising campaign that was covered by extensive media coverage. App. Vol. 1 at 5 (¶16); App. Vol. 5 at 1193 (¶¶ 20-22); App. Vol. 7 at 1709-25; App. Vol. 9 at 2181 (¶ 3), 2187 (¶ 23), 2189-90 (¶¶ 25-26), 2361-2370. Appellees advertise and market goods bearing the Accused Mark and Logo through local and national media, as does the NHL, and they also "benefit from news coverage of games and

---

[5] The court in *Univ. of Kan v. Sinks*, pointed to *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc*., 402 F. Supp. 2d 1312, 1337 (D. Kan. 2005), a case in which the court admitted evidence of a list of 763 businesses, 11 federal trademark registrations, and 33 state trademark registrations that were using some form of the disputed trademark – but still nevertheless "found that such evidence did not weaken the plaintiff's mark because not all of these third parties were using the mark on 'similar goods.'" *Univ. of Kan.*, 565 F.Supp.2d at 1232, n.27.

4911-9953-0642.v2

other team activities." App. Vol. 9 at 2206 (¶ 55), 2213-15 (¶¶ 65-67).  Appellees sell their hockey-related goods, including their hockey bags, online through exclusive licensees, including the NHL's online store.  App. Vol. 1 at 5-6 (¶ 17); App. Vol. 4 at 771-72 (¶¶ 23-24), 808-830.  Appellees proudly proclaim that they have enjoyed overwhelming commercial success with the Accused Mark and Logo. App. Vol. 1 at 2 (¶ 1); App. Vol. 9 at 2228-30 (¶¶ 87-93). Indeed, Appellees value the Mark at $100 million. App. Vol. 10 at 2484 (¶ 8).

These facts, combined with the conceptual strength of Mammoth Hockey's mark, pushes this factor firmly in favor of Mammoth Hockey.  *Wreal, LLC*, 38 F.4th at 129-130 (finding the commercial strength of Amazon's mark was "manifest and appears in the record," where Amazon admitted in its answer that the fireTV was launched with a major advertising campaign, was covered by major magazines and television networks, that it was a bestseller, and that Amazon advertised the fireTV on amazon.com, one of the most visited online shopping sites in the United States).

## III.   THE DISTRICT COURT ERRED BY FAILING TO FIND THAT MAMMOTH HOCKEY HAS ESTABLISHED IRREPARABLE HARM

The District Court committed clear error by concluding that Mammoth Hockey did not establish it will be irreparably harmed in the absence of an injunction, based on its finding that "Mammoth Hockey does not allege facts showing that its customer relationships have been harmed or otherwise establish how

[Appellees'] alleged actions have harmed its goodwill and market position." App. Vol. 12 at 2995.

As a preliminary matter, once the appropriate factors for likelihood of confusion in a reverse confusion case are properly applied and analyzed, Mammoth Hockey is likely to succeed on its claims of trademark infringement, and therefore its irreparable harm is presumed under the Trademark Modernization Act, 15 U.S.C. § 1116(a). *Instructure, Inc.*, 2022 U.S. Dist. LEXIS 2822, at *43-44.

The District Court's decision also failed to take into account that the very nature of Mammoth Hockey's reverse confusion claims establish its irreparable harm. In reverse confusion cases, the senior user is injured "because the public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Altira Group LLC*, 207 F. Supp. 2d at 1197.

Mammoth Hockey has built up goodwill over the past eleven years and a reputation for quality goods in the hockey community, where prominent and respected coaches and hockey players have praised Mammoth Hockey's hockey bags. App. Vol. 4 at 778-80 (¶¶ 42-43); App. Vol. 5 at 1177-87. But in May 2025, Appellees saturated the market with hockey bags and apparel bearing the Accused

Mark and Logo. App. Vol. 5 at 1193-94 (¶¶ 20-25); App. Vol. 7 at 1713-29. Appellees themselves acknowledge their own hockey equipment bags cost substantially less than Mammoth Hockey's "high-end hockey bags," and are of a different caliber than Mammoth Hockey's "specialty equipment bags." App. Vol. 1 at 2 (¶ 2), 30-31; App. Vol. 9 at 2205-06 (¶ 54).

Because Appellees saturated the market with merchandise bearing the Accused Mark and Logo, Mammoth Hockey will continue to lose value in its Mark and Logo, its product identity, control over its goodwill and reputation, and its ability to expand into new markets. Consumers will mistakenly believe Mammoth Hockey's hockey-related goods, including its hockey bags, are connected to Appellees' hockey team. App. Vol. 4 at 783-84 (¶¶ 54-55). Fans who support another team will not purchase Mammoth Hockey's hockey-related goods due to their mistaken belief that they would be supporting their team's rivals. App. Vol. 4 at 784 (¶ 56).

The record evidence therefore demonstrates that Mammoth Hockey will suffer irreparable harm. *Altira Group LLC,* 207 F. Supp. 2d at 1197; *see also SEBO Am., LLC v. Euraco Grp. Ltd.*, 2019 U.S. Dist. LEXIS 105393, at *7 (D. Colo. June 24, 2019) (where evidence established defendant had used the plaintiff's trademarks intending to trade on plaintiff's goodwill by online marketing of very similar, but inferior products, alongside legitimate plaintiff's products, court found plaintiff was

4911-9953-0642.v2

likely to suffer irreparable injury, and noted, "loss of control over business reputation and damage to goodwill are cognizable irreparable harms in the trademark infringement context"); *AAA Alarm & Sec. v. A3 Smart Home LP*, 2021 U.S. Dist. LEXIS 163919, at *20-21 (D. Ariz. Aug. 30, 2021) (in a reverse confusion case, court noted that "[i]rreparable injury is likely in the absence of an injunction where damage to a plaintiff's goodwill is likely").

## IV. CONCLUSION

Based upon the foregoing, Mammoth Hockey respectfully asks this Court to reverse the District Court's ruling and, to the extent necessary, remand for the District Court to determine any remaining issues of fact in light of this Court's decision on the appropriate test and treatment of the factors for assessing likelihood of confusion under the Lanham Act in a reverse confusion case.

4911-9953-0642.v2

## ORAL ARGUMENT REQUESTED

Mammoth Hockey requests oral argument because this case raises substantial and somewhat unresolved issues in this Circuit regarding the appropriate evaluation of the likelihood of confusion factors under the Lanham Act in a reverse confusion case. Mammoth Hockey believes oral argument would be helpful to the Court and for the parties and, in particular, facilitate any needed clarification of the factual, legal, and policy questions raised by these papers.

Dated: February 25, 2026

Respectfully submitted,

/s/ Gerald W. Griffin
Gerald W. Griffin
Leonardo Trivigno
Meredith B. Spelman
Janice J. Kwon
Allison Guerra
CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, New York 10005
212-238-8610
griffin@clm.com
trivigno@clm.com
spelman@clm.com
kwon@clm.com
guerra@clm.com

*Attorneys for Mammoth Hockey, LLC*

4911-9953-0642.v2

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the format and word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 32(g), this document contains 10,585 words. This document also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

All required privacy redactions have been made as required by 10th Cir. R. 25.5 and the ECF Manual. Additionally, this filing was scanned with the most updated Carbon Black antivirus software.


Dated: February 25, 2026

*/s/ Gerald W. Griffin*

Gerald W. Griffin

4911-9953-0642.v2

## CERTIFICATE OF SERVICE

I certify that on February 25, 2026, I caused the foregoing to be filed with this Court and served on all parties via the Court's CM/ECF filing system.

Dated: February 25, 2026

*/s/ Gerald W. Griffin*

Gerald W. Griffin

4911-9953-0642.v2

**Attachment 1**

**Order Denying Defendant's Motion for Preliminary Injunction, ECF No. 50 (Dec. 23, 2025)**

# UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UYTE, LLC and SEG HOCKEY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MAMMOTH HOCKEY, LLC, <br><br> Defendant. | **ORDER DENYING [29] MOTION FOR PRELIMINARY INJUNCTION** <br><br> Case No. 2:25-cv-00639-DBB-CMR <br><br> Judge David Barlow <br><br> Magistrate Judge Cecilia M. Romero |

Defendant Mammoth Hockey, LLC ("Mammoth Hockey") seeks an injunction preventing Plaintiffs SEG Hockey, LLC and Uyte, LLC (collectively "Plaintiffs") from any and all use of the UTAH MAMMOTH mark ("Accused Mark") and logo of a mammoth's head ("Accused Logo") (collectively "Accused Marks"), including marketing and selling hockey-related goods, apparel and accessories, including hockey bags, bearing the Accused Marks.[1] For the reasons stated below, the motion is denied.

## BACKGROUND

Mammoth Hockey is a small business in Portland, Oregon that designs and sells hockey-related goods, including "highly durable hockey bags."[2] Since 2014, Mammoth Hockey has manufactured, marketed, and sold its products bearing the MAMMOTH HOCKEY mark ("Mark") and an accompanying logo of a mammoth's head ("Logo") (collectively "Marks") through its website in forty-seven states and Canada.[3] In addition to its website, Mammoth

---

[1] Def. Mammoth Hockey, LLC's Mot. for Prelim. Inj. ("Mot."), ECF No. 29, filed Sept. 25, 2025.
[2] *Id.* 5.
[3] *Id.* Mammoth Hockey has sold its products in all U.S. states except Hawaii, Mississippi, and North Dakota.

Hockey maintains social accounts on Instagram, Facebook, and YouTube to promote its products and provide demonstration videos.[4] Mammoth Hockey also promotes its business at tournaments in the United States and Canada where it distributes stickers, hats, coupons, and postcards bearing its Marks.[5] Designed for durability, their hockey bags sell for around $189 to $275.[6]

Plaintiffs are the owners of Utah's National Hockey League ("NHL") team.[7] In 2024, Plaintiffs purchased the team formerly known as the Arizona Coyotes and relocated the team to Utah, where it played its first season under the temporary name UTAH HOCKEY CLUB.[8]

Plaintiffs invited fans to vote on the team's permanent name in a highly publicized selection process.[9] UTAH MAMMOTH was one of the initial options.[10] Plaintiffs subsequently learned of trademark issues with some of the names through their rejected trademark applications and third-party objections.[11] Mammoth Hockey did not object to the possibility of UTAH MAMMOTH, and when it became a finalist in June 2024, Mammoth Hockey remarked on Facebook that it was "pretty partial" to that name.[12]

In April 2025, Mammoth Hockey reached out to Plaintiffs about the possibility of a partnership when it learned that they had contacted a professional hockey player who had sponsored Mammoth Hockey about how to get in touch with it.[13] Co-owner Erik Olson reached out to Plaintiffs' representative to inquire about their intentions to use the Marks, remarking that

---

[4] *Id.* 6.
[5] *Id.* 6.
[6] Def.'s Reply in Further Support of Mot. for Prelim. Inj. ("Reply") 9, ECF No. 49, filed Nov. 13, 2025.
[7] Mot. 7.
[8] *Id.* 7.
[9] Pls.' Opp'n to Def.'s Mot. for Prelim. Inj. ("Opp'n") 2, ECF No. 37, filed Oct. 30, 2025.
[10] Mot. 1–2; Opp'n 2.
[11] Mot. 2; Opp'n 2 (detailing YETI's objection to the possibility of UTAH YETIS as a team name).
[12] Opp'n 2, 12.
[13] Mot. 8–9.

"If the Utah Hockey Club ends up being the Mammoth next season (I know you can't divulge) then it would be cool to talk about a possible collaboration."[14] Mr. Olson heard back from Plaintiffs' representative who stated that "they have not reached any determinations yet but will definitely keep this partnership in mind should things end up moving in that direction."[15]

On May 7, 2025, Plaintiffs officially unveiled "UTAH MAMMOTH" as the team name and a mammoth head as the new logo.[16] The announcement received considerable media coverage.[17] That day, Plaintiffs also began selling merchandise with the Accused Marks at a store in its home arena, the Delta Center, and learned that the United States Patent and Trademark Office ("USPTO") rejected its application for the Accused Mark.[18] As part of its merchandise, Plaintiffs sell hockey bags in the $83.99 to $119 price range.[19]

On June 10, 2025, Mammoth Hockey sent Plaintiffs a cease-and-desist letter, objecting to their use of the Accused Marks.[20] Plaintiffs responded that they were aware of Mammoth Hockey's Marks but confident they were not infringing on its trademark rights.[21] At the end of July, Mammoth Hockey asked Plaintiffs' counsel if they would accept service of a complaint for infringement.[22] The following day, Plaintiffs filed the complaint in this action.[23]

---

[14] *Id.* 9.
[15] *Id.* 9.
[16] *Id.* 9.
[17] Decl. of Christopher B. Armstrong in Support of Pls.' Opp'n to Def.'s Mot. for Prelim. Inj. ("Armstrong Decl.") ¶ 23, ECF No. 38, filed Oct. 30, 2025.
[18] Mot. 9–10; Decl. of Gerald W. Griffin in Support of Def.'s Mot. for Prelim. Inj. ("Griffin Decl.") ¶ 23, ECF No. 31, filed Sept. 25, 2025. In its decision, the USPTO required Plaintiffs to disclaim "UTAH" because it is geographically descriptive. Plaintiffs have challenged the decision and, as of this day, the application is still pending. *See* Mot. 10.
[19] Griffin Decl., Ex. 20; Reply 9.
[20] Mot. 11; Griffin Decl., Ex. 23.
[21] Mot. 11.
[22] *Id.* 11.
[23] *Id.* 11.

## STANDARD

"Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: '(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.'"[24] "The likelihood-of-success and irreparable harm factors are 'the most critical' in the analysis."[25]

"'A preliminary injunction is an extraordinary remedy, the exception rather than the rule.'"[26] "A preliminary injunction has the 'limited purpose' of 'preserv[ing] the relative positions of the parties until a trial on the merits can be held.'"[27] "Because a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal."[28]

In the Tenth Circuit, "[c]ertain types of preliminary injunctions are disfavored and require a movant to satisfy a heightened standard."[29] For example, "[a]n injunction is disfavored if '(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win.'"[30] If "any of these three characteristics are present, the moving party faces a heavier burden on the likelihood-of-success-

---

[24] *First W. Cap. Mgmt. Co.*, 874 F.3d 1136, 1141 (quoting *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016)).
[25] *Szymakowski v. Utah High School Activities Ass'n, Inc.*, 756 F. Supp. 3d 1238, 1246–47 (D. Utah 2024) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).
[26] *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Co.*, 916 F.3d 792, 797 (10th Cir. 2019)).
[27] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018) (quoting *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1258 (10th Cir. 2005)).
[28] *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).
[29] *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021).
[30] *Szymakowski*, 756 F. Supp. 3d at 1247 (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 797).

on-the-merits and balance-of-harms factors."[31] "The movant must make a strong showing that these factors tilt in its favor."[32] "The Tenth Circuit defines the 'status quo' as 'the last peaceable uncontested status existing between the parties before the dispute developed.'"[33] An injunction "falls into the all-the-relief category only if its effect, once complied with, cannot be undone."[34] "If the court probably can put the toothpaste back in the tube, then the heightened standard does not apply."[35]

Here, the court need not decide whether the injunction is mandatory or prohibitory because it fails under the lower, prohibitory, standard.[36] Therefore, the court applies the less demanding standard in its analysis.

## DISCUSSION

### I.    Likelihood of Success

In the Tenth Circuit, typically "the irreparable harm requirement must be satisfied before the other factors may be considered."[37] Yet the Lanham Act modified that order of operations when it was recently amended by Congress "to expressly allow a presumption of irreparable

---

[31] *Id.* (cleaned up).
[32] *Security USA Servs., LLC v. Invariant Corp.*, No. 1:20-cv-01100, 2021 WL 2936612, at *2 (D.N.M. July 13, 2021).
[33] *Szymakowski*, 756 F. Supp. 3d at 1247 (quoting *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3 (citing 11A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 2948 (3d ed & Nov. 2018 update)); *see also Dominion Video Satellite, Inc.*, 269 F.3d at 1155 (defining the status quo as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing" (citation omitted)).
[34] *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3 (citations and quotations omitted).
[35] *Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239 (D. Utah 2020) (citation and quotation marks omitted).
[36] *Universal Servs. of Am., LP v. Miner*, 2:25-cv-00795, 2025 WL 3022644, at *3 n.6 (D. Utah Oct. 29, 2025) ("Because the court finds that Plaintiffs are not entitled to preliminary relief even under the less demanding standard, it need not decide whether the heightened standard applies.").
[37] 11A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 2948 (3d ed & Sept. 2025 update) (citing *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021)).

injury when the owner of a trademark proves likelihood of success on the merits."[38] Therefore, the court first addresses likelihood of success before turning to irreparable harm.[39]

To prevail on a claim for trademark infringement under the Lanham Act, Mammoth Hockey must prove that it has a protectable mark,[40] that Plaintiffs are using a similar or identical mark "in connection with any goods or services," and that Plaintiffs' use "creates a likelihood of confusion."[41] "Of these factors, 'the central inquiry' is the likelihood of consumer confusion."[42]

Mammoth Hockey argues that it is likely to succeed on its claim for trademark infringement because all three elements are met.[43] Plaintiffs respond that the Accused Marks are dissimilar and there is no strong showing of reverse confusion.[44]

### A.    Protectability

Neither party disputes the protectability of Mammoth Hockey's Marks. Mammoth Hockey acknowledges the Marks are not registered with the USPTO but contends that its "first and continued commercial use" of them establishes its common law trademark rights.[45] In the Tenth Circuit, a party "acquires a protectable interest by 'using a distinct mark in commerce.'"[46] So long as a party makes "bona fide use of a mark in the ordinary course of trade" and "is the

---

[38] *Trial Lawyers Coll. v. Gerry Spence Trial Lawyers Coll. at Thunderhead Ranch*, 23 F.4th 1262, 1270 (10th Cir. 2022) (citing Trademark Modernization Act of 2020, Pub. L. 116-260, § 226(a), 134 Stat. 2200, 2208 (codified at 15 U.S.C. § 1116(a) (2020)).
[39] *See Szymakowski*, 756 F. Supp. 3d at 1246–47 ("The likelihood-of-success and irreparable harm factors are 'the most critical' in the analysis.") (quoting *Nken*, 556 U.S. at 434).
[40] Plaintiffs do not challenge Mammoth Hockey's ownership of a protectable mark, so this element is satisfied.
[41] *Equitable Nat'l Life Ins. Co., Inc.*, 434 F. Supp. 3d at 1239.
[42] *Id.* at 1239–40 (quoting *Beltronics USA, Inc. v. Midwest Inventory Dist., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)).
[43] Mot. 12–24.
[44] Opp'n 17–20.
[45] Mot. 1.
[46] *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1053 (10th Cir. 2021) (quoting *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015)).

first to use a particular mark, that person will prevail against subsequent users of the mark."[47] Here, it is undisputed that Mammoth Hockey has been continuously using the Marks since 2014 to sell hockey-related goods in most of the United States and Canada.[48] Therefore, the court concludes Mammoth Hockey is likely to succeed in proving it possesses a protectable trademark.

### B. Commercial Use

Mammoth Hockey contends this element was met on May 7, 2025, when Plaintiffs began selling merchandise, including hockey bags, with the Accused Marks.[49] As Plaintiffs do not contest this point, Mammoth Hockey is also likely to succeed on this element.

### C. Likelihood of Confusion

As mentioned above, "actions for trademark infringement under the Lanham Act turn in significant part on whether the allegedly infringing mark will cause a likelihood of confusion."[50] The Tenth Circuit evaluates likelihood of confusion under the following six factors:

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.[51]

"These factors are interrelated and no one factor is dispositive."[52]

---

[47] *Underwood*, 996 F.3d at 1053 (internal citations and quotation marks omitted).
[48] Mot. 1; Opp'n 25–26.
[49] Mot. 14.
[50] *Equitable Nat'l Life Ins. Co.*, 434 F. Supp. 3d at 1245.
[51] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).
[52] *Id.*

### 1.    Degree of Similarity Between the Marks

Of the six factors, "the degree of similarity is the most important factor."[53] Courts

measure similarity by "sight, sound, and meaning."[54] In analyzing these elements, courts "must

determine whether the allegedly infringing mark will confuse the public when singly presented,

rather than when presented side by side with the protected trademark."[55] Although "the dominant

portion is given greater weight, each mark still must be considered as a whole."[56]

 





---

[53] *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019).
[54] *Sally Beauty*, 304 F.3d at 972.
[55] *Id.*
[56] *First Sav. Bank, FSB v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996); *see also Sara Lee Corp. v. Sycamore Family Bakery Inc.*, No. 2:09-cv-523, 2009 WL 3617564, at *3 (D. Utah Oct. 27, 2009) ("Although the similarity of the marks is measured by the marks in their entireties, it is proper to give greater force and effect to the dominant portions of the parties' marks.").

Visually, the dominant portions of the competing trademarks share some similarities.[57] Both display "MAMMOTH" in all capital letters and use a similar, blocky font. Both also use a logo of a mammoth's head either above or to the left of the wording. Further, both trademarks are horizontally oriented.

However, as a whole, the Marks reveal significant differences. For example, "MAMMOTH" precedes "HOCKEY" in Mammoth Hockey's Mark and follows "UTAH" in Plaintiffs' Mark. The font is black, or brown, for both words in Mammoth Hockey's Mark while the font is bi-colored: blue (for "UTAH") and white (for "MAMMOTH") in Plaintiffs' Mark. The two "M"s in "Mammoth Hockey lean together and the remainder of the lettering appears purely vertically oriented, while the "Utah Mammoth" lettering all tilts toward the right off the vertical axis. The logo in Mammoth Hockey is a red, or brown, mammoth head that faces forward, while the logo in Plaintiffs' is a profile view of a mammoth head with "rock black, salt white, and mountain blue" colors.[58] And although both logos are mammoth heads, they are very stylistically distinct. Mammoth Hockey's mammoth head is smooth, streamlined, and minimalist, while Plaintiffs' mammoth head has jagged lines intended to represent the Wasatch Mountains; it also includes an outline of the state of Utah and a letter "M."[59] Both on initial and repeat consideration, these logos simply do not look similar. In sum, the court concludes that visually, the differences outweigh the similarities in the Marks enough that consumers are not likely be confused, even when the Marks are singly presented.

---

[57] The first set of images come from Mammoth Hockey's Motion and the second set comes from Plaintiffs' Opposition. *See* Mot. 16; Opp'n 18.
[58] Armstrong Decl. ¶ 15.
[59] *Id.* ¶ 24.

As to sound, which refers to pronunciation, the dominant portion—"MAMMOTH"—is identically pronounced. Taken as a whole, however, "MAMMOTH HOCKEY" does not sound similar to "UTAH MAMMOTH" both because "HOCKEY" does not sound like "UTAH" and because one precedes, rather than follows, "MAMMOTH." Thus, sound weighs against the similarity of the Marks.

As to meaning, Mammoth Hockey contends the Marks "create the same overall impression" of "strength, endurance and resiliency of a mammoth to the sport of hockey and hockey-related goods, including hockey bags."[60] Given that Plaintiffs do not dispute this point and consumers are likely to find this meaning since both trademarks use the same dominant word, meaning weighs in favor of similarity.

Mammoth Hockey relies on the dominant portion of the Marks to argue they are extremely similar.[61] For support, Mammoth Hockey offers the USPTO's rejection of "UTAH YETIS" and "UTAH VENOM," which were the other trademarks Plaintiffs considered. Mammoth Hockey argues that USPTO refused those marks, which included no logos or graphic elements, because "UTAH" is merely a geographic description.[62] Mammoth Hockey also argues that "HOCKEY" is merely descriptive of the type of goods sold, just as the district court in *Sara Lee Corp. v. Sycamore Family Bakery Inc.*, held that the word "Bakery" had "nominal commercial significance."[63] Because the dominant "MAMMOTH" is nearly identical in both parties' marks, then, Mammoth Hockey argues that this element is met.

---

[60] Mot. 16.
[61] *Id.* 15.
[62] Mot. 2, 7–8; Griffin Decl. ¶¶ 11–13, Exs. 9, 10, 11, 12; Opp'n 20 n.4.
[63] *Sara Lee Corp.*, 2009 WL 3617564, at *3.

In response, Plaintiffs argue that "UTAH" acquired trademark significance when the USPTO granted its "UTAH HOCKEY CLUB" mark without requiring a disclaimer of "UTAH."[64] Further, they argue that even if "UTAH" and "HOCKEY" lacked trademark significance, they cannot be entirely excluded when comparing the Marks.[65]

"While it is true that the dominant portion of each mark is entitled to greater weight in evaluating likelihood of confusion, each mark is to be considered as a whole."[66] For instance, in *Universal Money Centers, Inc. v. AT&T*, the Tenth Circuit held that terms which the USPTO have deemed merely descriptive of services, or otherwise "disclaimed" for trademark purposes, "cannot be ignored" when analyzing the similarity of marks because "disclaimed material still forms a part of the mark."[67] Therefore, the court may give more weight to "MAMMOTH" but it does not entirely ignore "UTAH" or "HOCKEY" in evaluating the degree of similarity.

In sum, the paramount similarity factor weighs against Mammoth Hockey.[68] The dominant portions of the marks are somewhat visually similar and share the same meaning, but taken as a whole, the marks' differences in pronunciation, color scheme, lettering orientation, and logo design outweigh the similarities.

---

[64] Opp'n 19; Decl. of Jessica Groen in Support of Plaintiffs' Opp'n to Def.'s Mot. for Prelim. Inj. ("Groen Decl."), Ex. 4, ECF No. 42, filed Oct. 30, 2025.
[65] Opp'n 19.
[66] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994).
[67] *Id.*
[68] *See Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019) (holding that "the degree of similarity is the most important factor").

### 2.    Intent of the Alleged Infringer in Adopting Its Mark

Under the next factor, the court must consider whether Plaintiffs "had the intent to derive benefit from the reputation or goodwill" of Mammoth Hockey.[69] "When a defendant intentionally uses the trademark of another it is presumed he did so in order to cause confusion between his products and those of the one holding the trademark."[70]

Mammoth Hockey contends this is a "reverse confusion" case, which it argues warrants a different intent inquiry of whether the alleged infringer "acted carelessly or otherwise culpably in selecting the allegedly infringing name."[71] Reverse confusion "occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user."[72] In such cases, the intent inquiry changes because "the junior user does not seek to profit from the good will associated with the senior user's mark."[73]

Here, Mammoth Hockey argues that Plaintiffs acted in bad faith when they saturated the market with the Accused Marks despite knowing that Defendant had used the Marks since 2014.[74] In response, Plaintiffs point out that the last time the Tenth Circuit addressed reverse confusion, in 1994, it did not apply this standard and held, instead, that the "proper focus remains whether defendant had intent to derive benefit from the reputation or goodwill of plaintiff."[75]

Following the Tenth Circuit, the court applies the traditional standard to this factor and concludes that it weighs in favor of Plaintiffs. Although Plaintiffs admit they were aware of

---

[69] *Delta Western Grp., LLC v. Ruth U. Fertel, Inc.*, No. 2:00-cv-0045C, 2000 WL 33710852, at *6 (D. Utah Sept. 28, 2000) (quoting *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987)).
[70] *Marker Int'l v. deBruler*, 635 F. Supp. 986, 999 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988).
[71] *Altira Grp. LLC v. Philip Morris Cos., Inc.*, 207 F. Supp. 2d 1193, 1200 (D. Colo. 2002).
[72] *Id.* at 1197 (citation omitted).
[73] *Id.* (citation omitted).
[74] Mot. 18.
[75] *See* Opp'n 20; *Universal Money Ctrs.*, 22 F.3d at 1532 (quotations marks and citation omitted).

Mammoth Hockey through their searches of the use of "Mammoth," it is unlikely they had the intent to benefit from Mammoth Hockey's goodwill or reputation.[76] For instance, Plaintiffs' hockey bags do not appear to be priced or designed to compete with Mammoth Hockey's high-end ones.[77] Further, Plaintiffs' use of the Mark goes well beyond selling hockey bags to include not only a wide array of goods, but also branding for a hockey team. Therefore, it would be unlikely that Plaintiffs sought to benefit from a small business's goodwill to sell goods associated with an NHL team.

Even if the court conducted a bad faith analysis under reverse confusion, Mammoth Hockey would not prevail. "A reverse confusion case is proven only if the evidence shows that the junior user was able to swamp the reputation of the senior user with a relatively much larger advertising campaign."[78] While market saturation is a mainstay of reverse-confusion cases, Mammoth Hockey has failed in its burden as the movant to prove that Plaintiffs have flooded the market. Specifically, Mammoth Hockey has provided no market-share or sales data or unrebutted evidence to support its claim that Plaintiffs have "saturated the market" of hockey-related goods with the Accused Marks.[79] At most, Mammoth Hockey offers its attorney's declaration about Google searches he ran for "mammoth hockey bags" and "mammoth hockey" that allegedly showed Plaintiffs' hockey bags and its team homepage as the top results for each, respectively.[80] Plaintiffs rebut these Google search results with their own that were conducted in three U.S.

---

[76] Opp'n 21.
[77] Mammoth Hockey's hockey bags sell for between $189 to $275, *see* Reply 9, and Plaintiffs' sell for between $83.99 to $119, *see* Griffin Decl. ¶ 37, Ex. 20. Additionally, none of Plaintiffs' bags use "MAMMOTH" alone on the bags. *See* Opp'n 27.
[78] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. & Dec. 2025 update).
[79] Mot. 18.
[80] Griffin Decl. ¶¶ 24–25.

geographic locations and yielded Mammoth Hockey as the top result for a "mammoth hockey bags" search.[81] Moreover, Mammoth Hockey seemingly concedes in its reply that Plaintiffs have not saturated the market when it argues that "Plaintiffs' survey was performed too soon to yield reliable evidence" because "[i]n reverse confusion cases, Eveready surveys do not yield useful results until the Accused Mark has fully saturated the market."[82] By contrast, Plaintiffs provide some evidence of other "Mammoth" logos in use in the market to support their claim that they "were aware of [Mammoth Hockey], but also myriad other parties using "Mammoth" for bags and sports services, and all peaceably coexisting in the marketplace."[83] Therefore, even under Defendants' proposed formulation, the factor would not be met because Mammoth Hockey has not met its burden to prove the requisite intent.

### 3.    Evidence of Actual Confusion

"Evidence of actual confusion in the marketplace is often considered the best evidence of a likelihood of confusion."[84] Actual confusion is generally introduced through consumer surveys and direct, anecdotal evidence.[85] Here, Plaintiffs offer the first type and Mammoth Hockey offers the second type.

In the Tenth Circuit, a survey's "evidentiary value depends on the methodology and questions asked."[86] Here, Plaintiffs hired an expert to conduct a survey that showed participants either Mammoth Hockey's bags as they appear in the marketplace or ones in which "MAMMOTH" was replaced with "MASTODON." Its results showed a net confusion

---

[81] Groen Decl. ¶¶ 9–10.
[82] Reply 8.
[83] Opp'n 21, 28–29.
[84] *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014).
[85] *See id.*
[86] *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1144 (10th Cir. 2013) (citation omitted).

percentage of -.07%.[87] Mammoth Hockey challenges the methodology and claims that it surveyed the wrong customer base.[88] Both parties agree that the proper universe to survey for a reverse confusion case is the senior user's customer base.[89] The survey included participants interested in "a premium, durable hockey bag," which fits well with how Mammoth Hockey describes their bags, but then specified that the bag "costs at least $100."[90] By selecting participants willing to pay as little as $100 for a hockey bag, the survey arguably used—or at least included—Plaintiffs' customer base. Yet it stands to reason that the undisputedly "specialized audience"[91] willing to pay between $189 to $275 on a premium hockey bag would be less likely confused than prospective buyers of cheaper bags.[92]

While both parties discuss the survey, neither does so in depth. For the foregoing reasons, at this stage the court considers the survey evidence to either be relatively weak or at least of unclear strength and so affords it less weight.

For its part, Mammoth Hockey presents limited anecdotal evidence of actual confusion.[93] In its motion, it recounts two instances in the last four months in which Mr. Olson's fellow hockey enthusiasts seemed confused about whether Mammoth Hockey was affiliated with Plaintiffs. The first instance involved someone approaching Mr. Olson when he was wearing one

---

[87] Opp'n 23; Decl. of Itamar Simonson, Ex. 1 ("Simonsen Report") ¶¶ 30–32, ECF 40-1, filed Oct. 30, 2025.
[88] Reply 8–9.
[89] Simonsen Report ¶ 18; Reply 8–9.
[90] Simonsen Report, Exhibit F, Table 4.
[91] Opp'n 31; Reply 9.
[92] *See, e.g.*, *Kodiak Cakes LLC v. Continental Mills, Inc.*, 358 F. Supp. 3d 1219, 1233–34 (D. Utah 2019) (stating that inexpensive items "are more likely to be confused than expensive items, which are typically chosen carefully").
[93] Mot. 19–20. In its Reply, Mammoth Hockey cites additional examples of alleged confusion which it did not raise in its Motion. Generally, courts do not permit new arguments or evidence in reply, since they deprive the opposing party of the opportunity to respond. *See In re Motor Fuel Temperature Sales Prcs. Litig.*, 872 F.3d 1094, 1113 n.5 (10th Cir. 2017) (citing *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011)). Accordingly, the court does not consider these belated examples at this time.

of his company's shirts and asking if the shirt was from Plaintiffs' hockey team.[94] The second incident occurred when Mr. Olson's teammate told him that another player had asked whether his Mammoth Hockey water bottle was from Plaintiffs' hockey team.[95] Mammoth Hockey also offers a Reddit post as evidence of confusion.[96] The post does not evince real confusion, but instead primarily holds forth on the individual's views about this lawsuit.

In the Tenth Circuit, "isolated instances of actual confusion may be de minimis."[97] This seems to be especially true if there is a lack of similarity between the competing marks.[98] Accordingly, these few, isolated instances of actual confusion are given little weight in the analysis. Taken together, the survey and direct evidence do not suggest much actual confusion.

### 4.    Similarity of Products and Manner of Marketing

"The greater the similarity between the products, the greater the likelihood of confusion."[99] Courts analyze this factor by considering the similarity of both the products themselves and the manner by which they are marketed.[100] The question is "not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both."[101]

---

[94] *See* Decl. of Erik Olson in Support of Def.'s Mot. for Prelim. Inj. ("Olson Decl.") ¶ 52, ECF No. 30, filed Sept. 25, 2025.
[95] *Id.* ¶ 53.
[96] Griffin Decl., Ex. 26 at 5, ECF No. 31-26, filed Sept. 25, 2025.
[97] *Universal Money Ctrs.*, 22 F.3d at 1535 (cleaned up); *see also Water-Pik*, 726 F.3d at 1150 ("We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis.").
[98] *See, e.g.*, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999); *Universal Money Ctrs.*, 22 F.3d at 1535–36.
[99] *Sally Beauty Co.*, 304 F.3d at 974.
[100] *See id.*
[101] *Instructure, Inc.*, 2022 WL 43829, at *12 (citation and quotation marks omitted).

Here, it is undisputed that both parties sell hockey-related products, including hockey bags.[102] Yet Plaintiffs primarily use the Accused Marks to sell professional hockey, making this case distinct from those in which "[l]ikelihood of confusion is obvious when two companies sell the same thing under the same name."[103] In other words, Plaintiffs use the Accused Marks to market an NHL team, which also includes selling branded hockey-related goods.[104] This service represents a material difference that undercuts similarity of products in reverse confusion cases.[105] Further, the hockey-related products themselves are seemingly different. Mammoth Hockey's bags are premium, "top shelf" products designed to be durable and priced to represent that high quality.[106] Plaintiffs' bags, however, are marketed at a lower price point for fans who want a bag for "moderate recreational and general usage."[107] Finally, Plaintiffs' hockey bags differ from Mammoth Hockey's because they do not contain "MAMMOTH" on them, unlike various bags available online from other third-party companies.[108] And, as noted above, the logos themselves look very different. Therefore, Mammoth Hockey has not shown that the products are similar enough to likely cause confusion.

In comparing the manner of marketing, the court also concludes that this factor is neutral. Granted, Plaintiffs sell their goods in physical stores, such as the Delta Center Store, Smith's

---

[102] *See* Mot. 20; Opp'n 25.
[103] *Sec. USA Servs., LLC v. Invariant Corp.*, 1:20-cv-01100, 2023 WL 2573293, at *5 (D.N.M. 2023).
[104] *See* Armstrong Decl. ¶ 55.
[105] *See, e.g.*, *Harlem Wizards Enterm't Basketball, Inc. v. NBA Props., Inc.*, 952 F. Supp. 1084, 1095 (D.N.J. Jan. 27, 1997) ("Meaningful differences between the products and services are often cited as a factor tending to negate reverse confusion, even when the products are superficially within the same category.").
[106] Mot. 30.
[107] Armstrong Decl. ¶ 54.
[108] Opp'n 27–30 (depicting images of bags bearing "MAMMOTH" logos from various companies, such as Mammoth Amateur Hockey Association, MammothCooler, Boji Mammoths, Mammoth Track Club, and Mammoth Mug); Armstrong Decl. ¶ 34.

Food & Drug, NHL shops, and Costco.[109] In contrast, Mammoth Hockey does not sell its goods in brick-and-mortar stores.[110] However, both parties sell hockey-related goods through online sales.[111] Given how common internet sales are, this similarity is expected. Therefore, the evidence suggests the parties' distinct manner of marketing might marginally reduce the likelihood of confusion, though the court assigns this factor little weight on this record.

### 5.    Degree of Care Likely to be Exercised by Consumers

"The greater the value of an article, the more careful the typical consumer can be expected to be."[112] Here, Mammoth Hockey's premium, high-end hockey bags are likely to be purchased by sophisticated consumers who exercise a high degree of care. Indeed, Mammoth Hockey is targeting hockey players who need durable bags, whereas Plaintiffs are targeting fans of their particular hockey team. Mammoth Hockey says little about this factor, except to argue that the Marks are "nearly identical" and that this necessarily attenuates the care a consumer might exercise.[113] But as noted earlier, the Marks are not "nearly identical." Therefore, this factor weighs against confusion.

### 6.    Strength or Weakness of the Mark

Turning to the final factor for likelihood of confusion, the court considers the strength of the mark. "The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."[114] Courts assess the strength of a mark in two aspects: "conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of

---

[109] Armstrong Decl. 22–24.
[110] Mot. 6.
[111] Mot. 20; Opp'n 26.
[112] *M Welles & Assocs., Inc. v. Edwell, Inc.*, 69 F.4th 723, 735 (10th Cir. 2023) (cleaned up).
[113] Mot. 21.
[114] *Sally Beauty Co.*, 304 F.3d at 975.

recognition in the marketplace."[115] Courts measure conceptual strength along a spectrum of distinctiveness.[116] The five categories on the spectrum, ranging from least to the most distinctive, are "generic, descriptive, suggestive, arbitrary, and fanciful."[117]

Mammoth Hockey asserts its Marks fall on the strong end of the spectrum as an "arbitrary" mark because it is "inherently distinctive."[118] In this context, "arbitrary" means "that the mark is a word or symbol already in common use that does not have any apparent relation to the product."[119] However, Mammoth Hockey states that it chose "MAMMOTH" because "it signifies strength, endurance and resilience due to the Ice Age animal's size and ability to survive harsh conditions."[120] Likewise, Plaintiffs chose "MAMMOTH," in part, because the animals "present a formidable image of strength and powerful momentum," as well as their "connection to the ice age [that] fits well with [Plaintiffs'] winter-leaning branding strategy."[121] The similar reasons that both parties chose "MAMMOTH" demonstrate the term is not arbitrary. Instead, the conceptual strength of the Marks is more accurately described as "suggestive, falling midway in the range of conceptual strength."[122]

Courts also consider how frequently a mark is used in the marketplace to determine conceptual strength.[123] "[E]xtensive third-party use of a component of a disputed term can undermine the strength of the term as a whole."[124] It is well-established in the Tenth Circuit that

---

[115] *Kodiak Cakes LLC*, 358 F. Supp. 3d at 1234 (quoting *Hornady Mfg. Co., Inc.*, 746 F.3d at 1007).
[116] *See Water Pik, Inc.*, 726 F.3d at 1152.
[117] *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1074 (10th Cir. 2023).
[118] Mot. 21.
[119] *Water Pik*, 726 F.3d at 1152.
[120] Olson Decl. ¶ 6.
[121] Armstrong Decl. ¶ 22.
[122] *Elevate Fed. Credit Union*, 67 F.4th at 1074.
[123] *Id.* at 1074–75.
[124] *Water Pik, Inc.*, 726 F.3d at 1152.

"extensive third-party use of the disputed term indicates that the term itself deserves only weak protection."[125] Here, Plaintiffs have presented evidence from a trademark research expert that many third parties use iterations of "Mammoth" to market sports teams and bags.[126] Given that, the Marks at this stage appear to have "relatively weak conceptual strength."[127]

In terms of commercial strength, a mark's strength is evaluated "in the relevant market, which is where the alleged confusion would arise."[128] In analyzing that market, courts consider a mark's "length and manner of use," its "nature and extent of advertising," and "the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."[129]

Mammoth Hockey asserts it has spent eleven years successfully advertising its high-end hockey bags.[130] Though it only refers to them in passing, Mammoth Hockey provides invoices for what appears to be several dozen hockey bag sales, as well as several different accessories, over the past decade that were shipped to many different states.[131] While this shows geographic and temporal diversity of its sales, the supplied invoices do not show a large sales volume.[132] Indeed, nowhere does Mammoth Hockey describe its overall sales volume or how many bags it has sold per year or by state. Mammoth Hockey also states that it has had numerous views of its YouTube channel and Facebook page, and that it has sponsored various hockey teams and

---

[125] *First Sav. Bank, FSB*, 101 F.3d at 654.
[126] Opp'n 32–33; Decl. of Frank A. Kelly in Support of Pls.' Opp'n to Def.'s Mot. for Prelim. Inj. ¶¶ 9–21 ("Kelly Decl."), ECF No. 41, filed Oct. 30, 2025.
[127] *Elevate Fed. Credit Union*, 67 F.4th at 1075.
[128] *Id.* at 1076.
[129] *Water Pik, Inc.*, 726 F.3d at 1154 (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)).
[130] Mot. 6–7 ("Defendant's highly durable hockey bags have received excellent reviews from prominent figures in the hockey community, which have also been viewed by hundreds of thousands of people.").
[131] Olson Decl., Ex. 9.
[132] *See id.* (including invoices of approximately eighty-eight sales).

tournaments.[133] Certainly this shows some effort at advertising. But it is generally lacking in context and specifics that would allow a determination of commercial strength. It is insufficient to support a finding of commercial strength.[134] Thus, Mammoth Hockey has not met its burden on this factor, so the commercial strength weighs against likelihood of confusion.

In sum, Mammoth Hockey has succeeded in showing it has a protectable mark and Plaintiffs are using a similar mark in commerce. However, it has not shown a likelihood of confusion.[135] Therefore, Mammoth Hockey has not demonstrated that it is substantially likely to succeed in its trademark infringement claim. Accordingly, it is not entitled to the Lanham Act's presumption of irreparable injury.[136] More critically, because Mammoth Hockey did not show that it is substantially likely to succeed on its trademark infringement claim, it cannot prevail on its motion for a preliminary injunction.

## II.    Irreparable Harm

As noted above, irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction."[137] "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."[138]

---

[133] Olson Decl. ¶¶ 38–41.

[134] See *Alfwear, Inc. v. Mast-Jagermeister US, Inc.*, No. 2:12-CV-00936-TC-DBP, 2021 WL 364109, at *9 (D. Utah Feb. 3, 2021) (finding insufficient extensive data and huge numbers of page views and advertising expenditures without necessary context), *aff'd sub nom. Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891 (10th Cir. Sept. 7, 2023).

[135] See *Equitable Nat'l Life Ins. Co., Inc.,* 434 F. Supp. 3d at 1239–40 (quoting *Beltronics USA, Inc.*, 562 F.3d at 1071).

[136] *See* 15 U.S.C. § 1116(a).

[137] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004); *see also* 11A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 2948 (3d ed & Sept. 2025 update) ("The Second and Tenth Circuits have stated that the irreparable harm requirement must be satisfied before the other factors may be considered.") (citing *State v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021).

[138] *Schrier*, 427 F.3d at 1267 (internal quotation marks and citations omitted).

Additionally, "a party requesting a preliminary injunction must generally show reasonable diligence."[139] "As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."[140] An "unnecessary and unexplained delay in seeking equitable relief undermines [Plaintiffs'] claim that they will suffer irreparable harm but for expedited preliminary relief."[141] "However, delay is but one factor in the irreparable harm analysis."[142] "The question instead is whether the delay was reasonable, was not a decision by the party to 'sit on its rights,' and did not prejudice the opposing party."[143]

Plaintiffs argue that Mammoth Hockey's delay was unreasonable because it knew on June 7, 2024 that UTAH MAMMOTH was under consideration as Plaintiffs' team name, yet it waited to object until June 10, 2025, when Mammoth Hockey sent Plaintiffs a cease-and-desist letter.[144] Plaintiffs also argue that Mammoth Hockey's "year-long delay" resulted in "extreme prejudice" because Plaintiffs have invested millions in the last year launching their team as the newest member of the NHL.[145]

---

[139] *Benisek v. Lamone*, 585 U.S. 155, 159 (2018).

[140] *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1543–44 (10th Cir. 1994) (quoting *New Jersey Ass'n of Health Care Facilities, Inc. v. Gibbs*, 838 F. Supp. 881, 928 (D.N.J. 1993)).

[141] *Are You Listening Yet Pac v. Henderson*, No. 2:24-cv-00104, 2024 WL 1051984, at *10 (D. Utah 2024) (waiting to seek injunctive relief until one week prior to signature gathering deadline was an "unnecessary and unexplained delay"); *see also Schiermeyer ex rel. Blockchain Game Partners, Inc. v. Thurston*, 697 F. Supp. 3d 1265, 1270 (D. Utah 2023) (two year delay in seeking injunctive relief undercut plaintiff's argument that "he urgently needs that relief to avoid a likely, imminent, and irreparable harm.").

[142] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) (citing *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984)) (eight year delay in seeking injunctive relief for trademark infringement showed lack of irreparable harm); (also citing *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004), *aff'd*, 425 F.3d 1249 (10th Cir. 2005) ("Plaintiffs' delay in seeking an injunction undermines their argument that they will suffer irreparable harm if an injunction does not issue.").

[143] *Fish*, 840 F.3d at 753 (citing *RoDa Drilling Co.*, 552 F.3d at 1211–12).

[144] Opp'n 12–15.

[145] *Id.* 16–17.

Mammoth Hockey responds that Plaintiffs cannot raise a laches argument because of their "unclean hands" in concealing their intent to infringe.[146] Moreover, Mammoth Hockey argues that the speed it took in bringing this action was reasonable because it did not learn of the infringement until May 7, 2025 and had to find trademark attorneys.[147]

Based on these facts, it does not seem that the delay by Mammoth Hockey was so unreasonable that the court should not consider the merits of its motion. The Tenth Circuit has held that a "three-month delay in filing did not defeat a claim of irreparable injury when the delay was attributable to plaintiff's attempts to negotiate and the need for further documentation of the harm."[148] Mammoth Hockey clearly knew about the possibility of Plaintiffs using "UTAH MAMMOTH" in April 2024. As noted earlier, Mammoth Hockey's co-founder texted Plaintiffs acknowledging that that "the Utah Hockey Club [might] end[] up being the Mammoth next season." However, Mammoth Hockey certainly hoped for and may have anticipated discussions about a possible partnership and arguably was reassured in that belief as late as April 2025.[149] When it became clear that Plaintiffs had no intention of partnering with Mammoth Hockey, it acted relatively swiftly in issuing its June 2025 cease-and-desist later. It is true that it did not then file its motion for preliminary injunction until September 2025. This pace did not suggest tremendous urgency, but it is not unduly slow on this record. Moreover, any delay on Mammoth Hockey's part in seeking injunctive relief is not dispositive.[150] Accordingly, the court turns to

---

[146] Reply 4.
[147] *Id.* 5.
[148] *RoDa Drilling Co.*, 552 F.3d at 1211.
[149] Mot. 8–9.
[150] *See id.*

Mammoth Hockey's arguments on how it will be irreparably harmed by continued use of the Accused Marks.

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."[151] This is "not an easy burden to fulfill"[152] and the movant "must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages."[153] "Purely speculative harm will not suffice."[154] "In trademark infringement cases, grounds for finding irreparable harm include loss of control of reputation, loss of trade, and loss of goodwill."[155]

Mammoth Hockey largely relies on the presumption of irreparable harm that accompanies a likelihood of success for trademark infringement.[156] However, Mammoth Hockey also alleges that Plaintiffs' saturation of the market with merchandise bearing the Accused Marks has harmed the goodwill and reputation for high quality hockey goods that it has built over the past eleven years.[157] As support, Mammoth Hockey points to a few instances of actual confusion among consumers and to Google searches for "mammoth hockey bags" that now pull up Plaintiffs' hockey bags as the first result.[158] Of course, standing alone, the fact that a particular search shows results both from the Plaintiffs and the Defendant does not itself show confusion.

---

[151] *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141 (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)).
[152] *DTC Energy Grp., Inc.*, 912 F.3d at 1270 (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).
[153] *Id.* (quoting *First W. Cap. Mgmt. Co.*, 874 F.3d at 1141).
[154] *RoDa Drilling Co.*, 552 F.3d at 1210.
[155] *Blendtec Inc.*, 2025 WL 2661555, at *10.
[156] Mot. 24.
[157] *Id.*
[158] Mot. 10, 19–20, Griffin Decl. ¶¶ 24–25.

"Although loss of good will and harm to market position are factors that can demonstrate irreparable harm, ultimately '[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain.'"[159] Mammoth Hockey does not allege facts showing that its customer relationships have been harmed or otherwise establish how Plaintiffs' alleged actions have harmed its goodwill and market position. Plaintiffs challenge Mammoth Hockey's Google searches with their own, conducted "in three different U.S. geographic locations" in September and in October.[160] They allege that the results show that Mammoth Hockey's website "almost always appears first" under a search for "mammoth hockey bags."[161] Mammoth Hockey's disputed evidence and speculations about future harm do not sufficiently establish the "certain, great, actual and not theoretical" injury necessary to satisfy this element.[162] Therefore, Mammoth Hockey has not established that it likely will be irreparably harmed if Plaintiffs are not enjoined from use of the Accused Marks.

Because Mammoth Hockey has not shown either that it is substantially likely to succeed on the merits or that it will suffer irreparable injury if its motion is denied, the court does not consider the balance of harms or public interest factors.

In sum, Mammoth Hockey has not met its burden to obtain a preliminary injunction of any and all use of the Accused Marks.

---

[159] *Red Cat Holdings, Inc., v. Matus*, No. 2:25-cv-00646, 2025 WL 3079176, at *5 (D. Utah Nov. 4, 2025) (quoting *Dominion Video Satellite*, 269 F.3d at 1156).
[160] Groen Decl. ¶ 9, Ex. 6.
[161] *Id.*
[162] *Schrier*, 427 F.3d at 1267 (internal quotation marks and citations omitted); *see also Dominion Video Satellite*, 356 F.3d *v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004) ("In defining the contours of irreparable harm, case law indicates that the injury 'must be both certain and great, and that it must not be merely serious or substantial.'") (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001)).

**ORDER**

Accordingly, Mammoth Hockey's Motion for Preliminary Injunction is DENIED.[163]


Signed December 23, 2025.

BY THE COURT

_____
David Barlow
United States District Judge

---

[163] ECF No. 29.